47 F.3d 473
 31 Fed.R.Serv.3d 1471
 CONSOLIDATED RAIL CORPORATION, Plaintiff-Appellee,
v.
TOWN OF HYDE PARK; Village of Cornwall, City of Buffalo;
Onondaga County; Buffalo City School District; Rochester
City School District; East Syracuse-Minoa Central School
District; Chautauqua County; Orange County;
Ravena-Coeymans-Selkirk Central School District; City of
Binghamton; Central School District and Monroe County, Defendants,
State Board of Equalization and Assessment of the State of
New York; David Gaskell, in his official capacity as
Executive Director of the Division of Equalization and
Assessment and his successors in office; Erie County; City
of Rochester and North Rockland Central School District,
Defendants-Appellants.
 Nos. 2025 to 2029, Dockets 94-7226, 94-7228, 94-7234,
94-7238 and 94-7240.
 United States Court of Appeals,
Second Circuit.
 Argued June 3, 1994.
Decided Jan. 31, 1995.
 
 Judith T. Kramer, Asst. Atty. Gen. of the State of N.Y. (G. Oliver Koppell, Atty. Gen. of the State of N.Y., of counsel), for defendants-appellants SBEA and David Gaskell.
 Linda S. Kingsley, Corp. Counsel, City of Rochester (Susan L. Hauser, Municipal Atty., of counsel), for defendant-appellant City of Rochester.
 James K. Riley, Pearl River, NY (O'Connell & Riley, of counsel), for defendant-appellant North Rockland Central School Dist.
 Kenneth Schoetz, County Atty., County of Erie, Buffalo, NY, for defendant-appellant Erie County.
 Gregory G. Fletcher, Memphis, TN (Heiskell, Donelson, Bearman, Adams, Williams & Caldwell; Loselle Greenawalt Kaplan Blair & Adler, James N. Blair, of counsel), for plaintiff-appellee.
 Before: NEWMAN, Chief Judge, OAKES and PRATT, Circuit Judges.
 GEORGE C. PRATT, Circuit Judge:
 
 
 1
 Consolidated Rail Corporation ("Conrail") is an interstate railroad that operates in New York State and elsewhere. Conrail filed this suit against the New York State Board of Equalization and Assessment and several tax-assessing and tax-collecting jurisdictions under Sec. 306 of the Railroad Revitalization Act and Regulatory Reform Act of 1976 ("4-R Act"), currently codified at 49 U.S.C. Sec. 11503. That section prohibits discriminatory taxation of railroads by states and their municipal subdivisions. Following substantial increases in its real-property tax assessments, triggered by the expiration of a law that provided an enhanced railroad ceiling, Conrail moved in the district court for a preliminary injunction against further assessment, levy, or collection of discriminatory ad valorem taxes in New York. The district court granted the preliminary injunction on conditions, and also granted Conrail's motion to certify a defendant class. For the reasons set forth below, we affirm both rulings.
 
 BACKGROUND AND FACTS
 
 2
 Conrail is an interstate carrier by rail that owns taxable rail-transportation property subject to ad valorem taxation in New York State. Its New York property is scattered among the assessing jurisdictions of some 309 towns, villages, cities, and counties across the state. Upon assessment determinations made by these 309 assessing jurisdictions, over 700 collecting jurisdictions--cities, towns, villages, school districts, and special districts--levy real property taxes that Conrail is required to pay annually. The assessments of Conrail's property made by each assessing district are based on, or at least affected by, valuations determined by the New York State Board of Equalization and Assessments ("SBEA").
 
 
 3
 Conrail contends that the taxes levied against it for 1993, which are calculated under the New York Real Property Tax Law ("NYRPTL") and based primarily on evaluations made by the SBEA, violated the 4-R Act by discriminatorily overvaluing Conrail's rail-transportation properties throughout the state.
 
 
 4
 The 4-R Act prohibits state and local governments from assessing railroad property for property tax purposes at a value that bears a higher ratio to its true market value than the ratio of assessed value to true market value for all other commercial and industrial property in the same assessment jurisdiction. In order to obtain relief under the statute, the ratio for Conrail's rail transportation property must exceed, by at least 5%, the calculated ratio with respect to all other commercial and industrial property.
 
 
 5
 Under New York's statutory system, the real-property tax assessments for Conrail's properties are legally and technically determined by the assessors for the municipalities that have assessing functions where the Conrail properties are located. NYRPTL Sec. 489-cc. In practical effect, however, the "railroad ceilings" that are determined by the SBEA become the actual assessments for Conrail's property in the vast majority of assessing jurisdictions in the state.
 
 
 6
 The NYRPTL provides for railroads a partial tax exemption known as the railroad ceiling. Under this exemption, the SBEA, a state agency, establishes a ceiling for the assessment of a railroad's property in each individual assessing jurisdiction; above that ceiling the owner of the railroad property is exempt from real property taxes. Thus, if a local assessor assessed a particular Conrail property at $100,000 and the "railroad ceiling" for that property was determined by the SBEA to be $90,000, Conrail would be exempt from any taxes that were based on the excess $10,000 of assessment. This railroad-ceiling legislation is found in NYRPTL Secs. 489-dd(4) and 489-ee, et seq. The method for calculating the railroad ceilings is specified by statute. NYRPTL Secs. 489-ee through 489-jj. These calculations are made by the SBEA and are, in part, a function of local property values set in each assessing jurisdiction by local assessors. This is because one component of the ceiling is the state equalization rate for each assessing jurisdiction. NYRPTL Sec. 489-ee(3).
 
 
 7
 To determine state equalization rates, the SBEA selects sample parcels in each assessing jurisdiction, appraises them to determine their respective market values, and then divides those market values by the assessed values for the selected parcels. Those assessed values represent local assessment determinations made by the assessors in each assessing jurisdiction. The results provide the state equalization rate for each assessing district.
 
 
 8
 For most properties, values are determined by local assessors. Railroad properties, however, receive special treatment in New York. In order to determine the railroad ceiling--the maximum amount at which a local jurisdiction may assess its railroad properties--the SBEA undertakes to evaluate all rail-transportation properties throughout the state--assessing district by assessing district. To do this it determines the local reproduction cost, which is sum of the reproduction costs less depreciation, and then adds to it the value of the land. This figure the SBEA treats as the true market value.
 
 
 9
 Next the SBEA computes an "economic factor", which is determined by dividing Conrail's operating expenses by its revenues, averaged over the last five years, and comparing the result to figures in a statutory table that indicates the economic factor to be applied. The local reproduction cost is then multiplied by the economic factor to give the full taxable value of the property.
 
 
 10
 The SBEA next consults its previously determined state equalization rates for the assessing jurisdictions. These represent the ratios in each jurisdiction of the total assessed value of taxable property to its estimated market value, expressed as a percentage.
 
 
 11
 Finally, the railroad ceiling for each assessing jurisdiction is calculated by multiplying the full taxable value of Conrail's rail-transportation property in that jurisdiction by the state equalization rate for that jurisdiction. The railroad ceiling thus computed represents the highest assessed value that an assessing jurisdiction may apply to Conrail's property. NYRPTL Sec. 489dd(4).
 
 
 12
 In 1987 the New York State legislature established an enhanced railroad ceiling by altering the economic factor so that it provided additional tax relief for railroads. That relief continued until the Spring of 1993 when the legislature considered extending this additional property tax exemption for railroads for another year, but ultimately failed to continue the exemption. Thus, on March 1, 1993, the enhanced railroad ceiling expired, with the result that in the great majority of New York's assessing jurisdictions, Conrail's tax assessments increased by seventy percent. The increase did not represent any change in true market value, but resulted from changes in calculating depreciation and from the legislature's change in the economic factor.
 
 
 13
 Conrail asserts, and defendants do not disagree, that most of the assessing jurisdictions simply adopt the railroad ceiling, as calculated by the SBEA, in lieu of making their own independent assessments of the railroad properties in their jurisdictions, and the record supports that assertion. In 1993, 248 of the 309 assessing jurisdictions (80%) assessed Conrail's transportation property at the railroad ceiling, and 17 others assessed within 3% of the ceiling. Twenty-one jurisdictions assessed at the lower 1992 ceiling applicable before lapse of the five-year-old enhanced railroad ceiling, but this presumably indicates that the assessment rolls in those jurisdictions had not been updated after the enhanced railroad ceiling expired.
 
 
 14
 For the 1993 tax year, the SBEA fixed the railroad ceilings on Conrail's rail-transportation property in all of New York State at a total of $580 million, based on an appraised true market value of $924 million. Conrail maintains, however, that the true market value of its taxable rail property is $451 million. If Conrail is correct, its state-wide ratio of assessed to market value would be 129% ($580 million divided by $451 million = 129%).
 
 
 15
 In contrast, the same ratio for all other commercial and industrial property in the state is an average of 48%. Thus, Conrail contends, its assessments in New York State are vastly excessive and must be reduced so that the nondiscrimination requirement of the 4-R act is satisfied. Applying the 48% ratio of commercial and industrial property to Conrail's claimed true market value of $451 million would reduce its New York assessments by $216 million to $235 million.
 
 
 16
 On September 20, 1993, Conrail filed this class-action suit against the SBEA; its executive director, David Gaskell; and selected assessing jurisdictions and taxing districts around the state. It claims that in calculating the railroad ceilings the SBEA overvalued its rail-transportation properties, so that when the vast majority of the assessing jurisdictions in the state followed their usual practice and adopted the ceilings as their local assessments, it caused assessment-ratio discrimination in violation of the 4-R Act.
 
 
 17
 Conrail did not dispute the assessments on its properties up to the amounts that had been assessed in 1992--before the enhanced railroad ceiling expired. After the increases, however, Conrail brought this action and moved for a preliminary injunction against the further assessment, levy, or collection of the disputed portion of its 1993 tax bills that were payable beginning January 31, 1994, i.e., the amounts that exceeded what the levies would have been if based on the 1992 assessment levels. Conrail also moved to certify a defendants' class under F.R.C.P. 23.
 
 
 18
 In support of its motions, Conrail relied on the affidavits of several financial and economic experts who explained and criticized the SBEA's method of calculating the railroad ceiling. In particular they challenged the SBEA's use of the "cost approach", which calculates true market value as replacement cost of improvements less depreciation plus land value. Conrail's experts preferred alternate valuation methods: 1) the "income capitalization method", which converts anticipated future economic benefits to present value by discounting the periodic income attributable to an asset over its economic life; and 2) the "stock and debt method", which calculates true market value by adding the market value of all outstanding securities to the value of leased property and other obligations.
 
 
 19
 The defendants countered that the state did not assess properties; that only the local jurisdictions made assessments; that the state was, in any event, entitled to choose its own method of valuation; and that its choice, the cost approach, produced the true market value for Conrail's properties. They also challenged several aspects of the appraisals and calculations made by Conrail's experts.
 
 
 20
 On January 7, 1994, the district court granted Conrail's motion for a preliminary injunction and certified the defendant class. As to the preliminary injunction, the district judge indicated that he was guided by the plain meaning of the statute, and based on the uncontested facts, he found reasonable grounds to believe that a violation of the statute had occurred, or was about to occur, and that injunctive relief was required. He therefore enjoined anyone having actual notice of his order from collecting 1993 taxes from Conrail in excess of the amount of tax calculated under Conrail's 1992 railroad ceiling in each jurisdiction, multiplied by the applicable 1993 tax rates.
 
 
 21
 To protect the interests of the affected municipalities, the district judge further ordered: 1) that Conrail deposit into the court registry the additional taxes whose collection he had enjoined; 2) that Conrail pay to each jurisdiction that issues a tax bill, the amount of 1993 ad valorem taxes not enjoined by his order; 3) that all tax collecting jurisdictions to whom Conrail pays 1993 taxes must accept the reduced payments; 4) that all taxing jurisdictions are enjoined from initiating adversary proceedings regarding the deficit in the tax payments; 5) that Conrail post a $1 million dollar bond as security for payment of penalties, interest, or other damages should they accrue; 6) that there be a prompt trial on the merits; and 7) that notice of the order be served upon each taxing jurisdiction to which Conrail pays ad valorem taxes.
 
 
 22
 As to certification of the defendant class, the district judge defined the class as
 
 
 23
 all New York assessing, levying or collecting jurisdictions in which Conrail holds rail transportation property subject to ad valorem taxation or to which Conrail pays ad valorem taxes.
 
 
 24
 The court also held that while the SBEA and its executive director are proper parties to the action, they should not be class representatives, because they might represent interests that differ from those of the assessing and collecting entities. Instead, he held:
 
 
 25
 The class representatives shall consist of the defendants presently before the court which have actually appeared in this matter prior to today and also the 10 largest taxing entities in terms of money paid to them who are affected by the final judgment in this case.
 
 
 26
 The district judge also found that pursuant to F.R.C.P. 23(b)(3), a class action is superior to any other method for a fair and efficient adjudication of the controversy, because the interests of any individual member in controlling its defense is minimal; in any event, however, the court indicated that any member of the class was free to opt out of the class and intervene as a party so as to be able to present its own defense. (We were told by counsel on this appeal that no one had opted out and that the time to do so had expired.)
 
 
 27
 The court found that the case should be litigated in a single forum because the issues are "rather narrow" and that "the issue of fair market value is [not] necessarily directly related to taxing entity boundaries but rather probably reflects more clearly the segments or portions of Conrail's system in the state of New York."
 
 
 28
 The SBEA and its executive director, David Gaskell, Erie County, the City of Rochester, and North Rockland Central School District now appeal from these orders, contending that: (1) the preliminary injunction should not have been granted, because Conrail presented no reliable evidence upon which to establish a violation of the 4-R Act; and (2) that the defendant class certified by the district court failed to satisfy the requirements of F.R.C.P. 23.
 
 DISCUSSION
 
 29
 A. Preliminary injunction.
 
 
 30
 We note first that an interlocutory order granting a preliminary injunction is appealable under 28 U.S.C. Sec. 1292(a)(1).
 
 
 31
 The SBEA, its executive director, and three of the municipal defendants contend that the district court abused its discretion when it granted the preliminary injunction. They argue that the SBEA is not an assessing jurisdiction; that its railroad ceilings are not assessments; that the SBEA may choose what method is to be used to determine true market value; and that the evidence presented was insufficient to support the conclusion that a violation of the 4-R Act occurred, or was about to occur. They also assert that the district court lacked the "probative evidence" required in order to determine either 1) the value of Conrail's property in New York State, or 2) the value of all other commercial and industrial property in the state.
 
 
 32
 Traditionally and generally, "[a] preliminary injunction may issue if the plaintiff demonstrates irreparable harm, and either a likelihood of success on the merits, or sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in its favor". Polymer Technology Corp. v. Mimran, 975 F.2d 58, 61 (2nd Cir.1992) (citations omitted). We review the granting of a preliminary injunction for abuse of discretion. Id.
 
 
 33
 However, a railroad seeking statutorily authorized injunctive relief from alleged tax discrimination under the 4-R Act is not governed by these equitable criteria. Burlington Northern R. Co. v. Department of Revenue of State of Wash., 934 F.2d 1064 (9th Cir.1991). For such a statutory injunction, a railroad need only demonstrate that there is "reasonable cause" to believe that a violation of the 4-R Act has occurred or is about to occur. CSX Transp. v. Tennessee Bd. of Equalization, 964 F.2d 548, 551 (6th Cir.1992).
 
 
 34
 1. The 4-R Act.
 
 
 35
 The purpose of the Railroad Revitalization and Regulatory Reform Act of 1976 was to "provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system in the United States". Pub.L. 94-210 Sec. 101(a); see Burlington Northern R. Co. v. Oklahoma Tax Com'n., 481 U.S. 454, 457, 107 S.Ct. 1855, 1857-58, 95 L.Ed.2d 404 (1987); Union Pacific R. Co. v. Public Utility Com'n., 899 F.2d 854, 857 (9th Cir.1990). As applied to this case the 4-R Act provides, in relevant part, as follows:
 
 
 36
 (b) The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a state or subdivision of a State may not do any of them:
 
 
 37
 (1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property;
 
 
 38
 (2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection;
 
 
 39
 * * * * * *
 
 
 40
 (c) Notwithstanding section 1341 of title 28 [the Tax Injunction Act] and without regard to the amount in controversy or the citizenship of the parties, a district court of the United States has jurisdiction * * * to prevent a violation of subsection (b) of this section. Relief may be granted under this subsection only if the ratio of assessed value to true market value of rail transportation property exceeds by at least 5 percent, the ratio of assessed value to true market value of other commercial and industrial property in the same assessment jurisdiction. The burden of proof in determining assessed value to true market value is governed by State law.
 
 
 41
 * * * * * *
 
 
 42
 49 U.S.C. Sec. 11503.
 
 
 43
 We note that while subsection (b) of the statute requires that there be no discrimination at all between railroad property and other commercial and industrial properties in the ratios of their assessments, subsection (c) denies the railroad any remedy unless it proves that its own ratio exceeds the other properties' ratio by at least 5%. While the issue has not been focussed on so far in this case, there has been some dispute in the case law as to whether the 5% refers to 5% of the railroad's ratio, or to 5% of the ratio for the other properties, or to five percentage points between the two ratios. See, e.g. Ogilvie v. State Bd. of Equalization, 657 F.2d 204 (8th Cir.1981); Southern Ry. v. State Bd. of Equalization, 712 F.Supp. 1557, 1565-66 (N.D.Ga.1988); Arkansas-Best Freight System, Inc. v. Cochran, 546 F.Supp. 904 (M.D.Tenn.1981); and Louisville and Nashville R. Co. v. Louisiana Tax Commission, 498 F.Supp. 418 (M.D.La.1980).
 
 
 44
 As a guide to the parties and to the district court in the further proceedings that will probably be necessary in this action, we think the language of the statute is clear: when it says that the railroad ratio must exceed the ratio of the other properties by 5%, it intends to apply the 5% to the ratio for the other properties. In this case, therefore, should it ultimately be proven, for example, that the ratio for the other properties is 48%, as Conrail alleges, then in order to obtain any remedy, Conrail would have to prove that the ratio for its own properties was in excess of 105% of 48%, or in other words that it exceeded 50.4%.
 
 
 45
 As the case is now presented to us, the discrepancy in ratios is far greater than the 5% required to entitle Conrail to relief, provided however, that the true market value of Conrail's property is significantly below the value assigned to it by the SBEA. Of course, the SBEA's evaluation is based on the cost approach, and the use of that method is very much in dispute. However, we need not determine at this juncture the ultimate validity of the method of valuation used by the SBEA; our threshold issue is whether, based on the evidence presented, the district court had reasonable cause to believe that a violation of the 4-R Act had occurred or was about to occur.
 
 
 46
 2. The Calculations.
 
 
 47
 Conrail's ultimate obligation will be to demonstrate that the ratio of assessed to market value of its property exceeded, by at least 5%, the same ratio for all other commercial and industrial property in the assessing districts.
 
 
 48
 Conrail provided affidavits from three experts to show that all of its transportation property in New York had an "assessed value" of $580 million and a "true market value" of $451 million, thus indicating a ratio for the whole state of 129%. By contrast, the corresponding ratio of assessed value to market value for commercial and industrial properties in New York State was calculated at 48%.
 
 
 49
 If Conrail's figures are correct, therefore, the 129% ratio of "true market value" to "assessed value" of Conrail's railroad property in New York is far in excess of the ratio for corresponding commercial and industrial property and therefore violates the 4-R Act. Of the four figures underlying this determination three are not seriously in dispute: Conrail's assessed valuation, and the assessed and true market values of other commercial and industrial properties. All of those figures Conrail takes from defendants' records. The major controversy is over the fourth figure in the calculation--the true market value of Conrail's property.
 
 
 50
 This controversy stems primarily from the difference in appraisal methods. The SBEA had used the "cost approach" method for determining true market value, while Conrail's experts have applied both the "income capitalization method" and the "stock and debt" method. However, even if defendants' true market value of $974 million is accepted, the resulting ratio for Conrail would be 63% ($580 assessed value / $924 true market value = 63%), and this, too, would be a violation of the 4-R Act.
 
 
 51
 Even at this simplistic level, therefore, it appears that the district court had reasonable cause to find that for the 1993 tax year the 4-R Act was violated or was about to be violated.
 
 
 52
 3. The "Assessment".
 
 
 53
 Defendants also argue that the railroad ceiling is not an "assessment" within the meaning of the 4-R Act. An "assessment" under the 4-R Act is defined as a "valuation for a property tax levied by a taxing district." 49 U.S.C. Sec. 11503(a)(1).
 
 
 54
 In New York, railroads are entitled to a partial tax exemption, known as the railroad ceiling, codified as NYRPTL Sec. 489aa et seq. The railroad ceiling represents the maximum assessed value at which railroad property may be taxed, and it is calculated by the SBEA as follows:
 
 
 55
 1) Determine AVERAGE RAILWAY REVENUES for most recent five years.
 
 
 56
 2) Determine AVERAGE RAILWAY EXPENSES for most recent five years.
 
 
 57
 3) Calculate the RATIO to the nearest thousandth of one percent.
 
 
 58
 RATIO = AVERAGE EXPENSES / AVERAGE REVENUES4) Determine ECONOMIC FACTOR from statutory table, interpolating to nearest
 
 
 59
 tenth of one percent.
 RATIO FACTOR ECONOMIC FACTOR
 1.0 or more 20%
 .9 40%
 .75 or less 100%
 
 
 60
 5) Determine LOCAL REPRODUCTION COST for each assessing unit:
 
 
 61
 a = (Cost of reproduction new) - (depreciation of RR real property other
 
 
 62
 than land)
 
 
 63
 b = (value of land) k (value of rights in land)
 
 
 64
 c = LOCAL REPRODUCTION COST = a k b
 
 
 65
 6) Determine STATE EQUALIZATION RATE for each assessing jurisdiction.
 
 
 66
 STATE EQUALIZATION RATE = assessed value / full market value.
 
 7) Calculate TAXABLE VALUE:
 
 67
 TAXABLE VALUE = LOCAL REPRODUCTION COST x ECONOMIC FACTOR
 
 8) Calculate RAILROAD CEILING:
 
 68
 RAILROAD CEILING = TAXABLE VALUE x STATE EQUALIZATION RATE
 
 
 69
 One of the key elements in computing the railroad ceiling is the state equalization rate, which represents the ratio of total assessed values of taxable real property in an assessing unit to the total of SBEA's estimates of market values of those properties. The SBEA determines the equalization rate periodically for each assessing unit in the state.
 
 
 70
 In order to determine the value of taxable real property in the state, the SBEA cannot simply adopt the local "assessed" value, due to the incompatible local calculations of assessed value. The SBEA, therefore, is charged with "equalizing" these discrepancies by setting a standard known as "full value". SBEA appraisers examine a random sample of properties from each assessing unit to determine their market values. These appraised market values are compared to the assessed values established in the assessing unit, to produce a ratio of assessed value to market value for that unit. Understanding the Equalization Rate, (New York State Division of Equalization and Assessment 1990), 2-3.
 
 
 71
 We recognize that as a formal matter each assessing district makes its own determination of the final assessed value for Conrail's property in the district. Whatever assessment is fixed is then used by each taxing district to calculate local taxes charged to Conrail. The record shows, however, a widespread adoption of the railroad ceilings fixed by the SBEA. The vast majority of assessing units apparently make no separate, independent valuations of Conrail's property in fixing the local assessed value. Instead, they simply adopt the ceiling calculated by the SBEA. Realistically, therefore, when the SBEA determines the railroad ceiling for the 309 assessing districts in the state that include Conrail property, it is in practical effect determining Conrail's actual assessments in 80% of those districts. Consequently, for the great majority of assessing jurisdictions the railroad ceiling fixed by the SBEA is "a valuation for a property tax" that will be "levied by a taxing district." It therefore fits the statute's definition of an "assessment". 49 U.S.C. Sec. 11503(a)(1).
 
 
 72
 4. Method of Appraisal.
 
 
 73
 Relying primarily on a decision by the fourth circuit in Chesapeake Western Ry. v. Forst, 938 F.2d 528 (4th Cir.1991), the SBEA contends that Conrail is bound by the method of appraisal that the SBEA has chosen, and that since it chose to use the cost approach, it is improper to consider any other method of valuation in fixing the "true market value" of Conrail's properties. The Chesapeake court viewed the method of appraisal as a matter of state policy that was beyond the reach of the 4-R Act. We do not accept that interpretation of the statute. What the 4-R Act prohibits is discrimination against railroads in the ratios of two sets of numbers: assessed values and true market values of the railroad's property vis a vis those of other commercial and industrial properties. To avoid the prohibited discrimination, the SBEA must apply the same valuation standards and methods to the railroad property as are used on the commercial and industrial properties to which it is compared. If the Act were to be interpreted, as defendants would have it, so that the SBEA could adopt a special appraisal method for railroads alone, then the whole nondiscrimination objective of the statute could be circumvented.
 
 
 74
 On the record before us it appears--from the marked increase in assessments that occurred when the enhanced railroad ceiling lapsed as well as from the state's own evaluation of the true market value of Conrail's properties--that the disparity in ratios substantially exceeds the 5% tolerated by the 4-R Act. We therefore conclude that the district court did not err in determining that there was reasonable cause to believe that the 4-R Act was violated or was about to be violated. Nor did the district court abuse its discretion in granting a preliminary injunction, conditioned as it was on financial protections to the defendant taxing districts. We therefore affirm the order of the district court granting the preliminary injunction.
 
 
 75
 We realize that once the court has determined the proper method for the SBEA to calculate the railroad ceiling so as not to violate the 4-R Act, there may still be a few problems remaining whose solution is not then readily apparent. When and if that stage is reached, the district court has ample discretion under current class-action law to fashion suitable relief either by establishing subclasses or by decertifying the defendant class once it has served its purpose. We are fully confident that the district court will be able to fashion relief appropriate to the circumstances.
 
 
 76
 B. Class certification.
 
 
 77
 Defendants-appellants North Rockland Central School District, Erie County, and the City of Rochester challenge the district court's certification of the defendant class. They claim that Conrail failed to demonstrate commonality, typicality, and adequacy of representation--three of the four requirements of F.R.C.P. 23(a).
 
 
 78
 An order granting or denying class certification is not itself appealable. Gardner v. Westinghouse Broadcasting Co., 437 U.S. 478, 98 S.Ct. 2451, 57 L.Ed.2d 364 (1978). However, a court of appeals that has jurisdiction over one appealable order may simultaneously exercise pendent appellate jurisdiction over an otherwise non-appealable order, (Port Authority Police Benevolent Association Inc. v. Port Authority of New York and New Jersey, 698 F.2d 150, 153 (2d Cir.1983)), although acceptance of pendent jurisdiction is discretionary. General Motors Corp. v. Gibson Chemical & Oil Corp., 786 F.2d 105, 108 (2d Cir.1986). Here, the district court's order granting a preliminary injunction, which is an appealable order under 28 U.S.C. Sec. 1292(a), provides us directly with appellate jurisdiction; we also have discretion under the doctrine of pendent appellate jurisdiction to review the district court's related order certifying the defendant class, and in the circumstances of this important case we choose to exercise that discretion.
 
 
 79
 A district court's decision to certify a class will be overturned only if the district court abused its discretion. See In re Drexel Burnham Lambert Group, Inc., 960 F.2d 285, 290 (2d Cir.1992). We hold that the district court did not abuse its discretion in certifying the class under Rule 23, and thus affirm the order granting class certification.
 
 F.R.C.P. 23(a) specifies that
 
 80
 one or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.
 
 
 81
 Although plaintiff classes are certified more frequently, we have held that the above requirements apply equally to plaintiff and defendant classes. See Marcera v. Chinlund, 595 F.2d 1231, 1237 (2d Cir.1979), vacated on other grounds, 442 U.S. 915, 99 S.Ct. 2833, 61 L.Ed.2d 281 (1979).
 
 
 82
 1. Numerosity.
 
 
 83
 In the State of New York there are over 700 tax-collecting jurisdictions to which Conrail pays taxes, and those taxes are based in part on assessed valuations imposed by over 300 assessing jurisdictions. To the extent that there are common issues affecting the defendants, individual adjudications of Conrail's claims would be unnecessarily expensive and time-consuming, and enormously burdensome on the courts. A group of this size would make the joinder of individual members as named defendants impracticable. See In re Drexel, 960 F.2d at 290. Because numerosity is presumed at a level of 40 members (1 Newberg On Class Actions 2d, (1985 Ed.) Sec. 3.05), whether viewed as 700 tax-collecting jurisdictions or 300 assessing jurisdictions, the number of defendants vastly exceeds this threshold. Numerosity is therefore satisfied.
 
 
 84
 2. Common Questions of Law or Fact.
 
 
 85
 Each jurisdiction is mandated by NYRPTL not to exceed the railroad ceilings established by the SBEA, and 80% of the jurisdictions simply adopt the ceilings as their Conrail assessments. Should the district court ultimately find that SBEA's calculation of the railroad ceilings produced assessments that violate the 4-R Act, as Conrail contends and has preliminarily demonstrated, then the 309 assessing jurisdictions must recalculate their assessments for Conrail's properties, and the 700 tax-collecting agencies will have to recalculate the taxes levied against those properties and make appropriate monetary adjustments.
 
 
 86
 It is true, as defendants contend, that each of the 309 assessing jurisdictions acts independently in fixing the assessed values of Conrail's taxable properties within its boundaries. But that appears to be more formal and technical than substantive, in light of the fact that most jurisdictions make no attempt to separately evaluate Conrail's property, but simply adopt the state's railroad ceilings as their own assessments. We therefore reject defendants' assertion that the individual valuation issues would necessarily predominate at trial.
 
 
 87
 3. Typicality of Defenses.
 
 
 88
 Rule 23(a)(3) is satisfied "when each class member's [defense] arises from the same course of events, and each class member makes similar legal arguments to [defend against the plaintiff's allegations]". In re Drexel, 960 F.2d at 291.
 
 
 89
 The arguments advanced by those who oppose having a defendants' class offer the firmest proof that the requirement of F.R.C.P 23(a)(3) is satisfied. The proffered defenses are typical to all members of the proposed defendants' class: 1) each locality plays a different role in assessing and collecting taxes from Conrail; 2) each assessing entity acts independently to determine property values; 3) some defendants are just collecting entities and have no role in the assessment scheme; and 4) the key issue does not involve individual taxing entities, but stems from the SBEA's interpretation of how to calculate the railroad ceiling.
 
 
 90
 Each member of the defendant class participates in New York's system of taxation. Whether a particular defendant is an assessing entity or a collecting entity, or both, it is still a part of the New York system for taxing railroad properties, a system that is, in large part, operated and controlled by the SBEA.
 
 
 91
 4. Adequacy of Representation.
 
 
 92
 F.R.C.P. 23(a)(4) does not require a willing representative, merely an adequate one. Where there are legal issues common to the class, the representative who defends his own interests will also be protecting the interests of the class. Marcera v. Chinlund, 595 F.2d at 1239.
 
 
 93
 Although most class certifications deal with a plaintiff class, we think that under the circumstances of this case the district court properly exercised its authority to certify a defendant class. Unlike a plaintiff class, where the named plaintiffs willingly choose to litigate as class representatives, the designated representatives in a defendants' class do not choose to be sued. The district court, however, appropriately granted the designated representatives--the named defendants together with the 10 highest tax collectors in the defendant class--an opportunity to present reasons why they should be excluded as representatives.
 
 
 94
 The class representatives would have us believe that none have an interest in the outcome of this case beyond their own respective jurisdictions. They assert that their only interest is in preserving their own taxable property base. As a result, they contend, the thrust of the appraisers' expert testimony on valuation would be narrowly focused on individual properties in particular districts, so that no defendant could adequately represent other class members.
 
 
 95
 By including as class representatives the 10 highest tax collectors from Conrail as well as all of the named defendants except the SBEA and its director, the district judge created a fair group of representative parties who presumably have the greatest financial motivation to defeat Conrail's case.
 
 
 96
 The designated representatives control a substantial part of Conrail's total assessment in New York State and therefore have sufficient interest in the outcome to fairly and adequately represent the remaining class members. It may be true, in a narrow sense that no local entity has a particular stake beyond its own borders; but behind the particularity of each local assessment lies the dominating, common issue of whether the SBEA's calculation of the railroad ceiling produces results throughout the state that violate the 4-R Act. If the railroad ceilings must be changed, then the assessments and the local taxes that are based on those assessments must also be changed in that great majority of assessing and taxing jurisdictions who simply adopt the figures determined by the SBEA.
 
 
 97
 Therefore, we are satisfied that in defending their own interests, the designated representatives will adequately and fairly protect the interests of the remaining class members in compliance with F.R.C.P. 23(a)(4).
 
 
 98
 5. F.R.C.P. 23(b)(3).
 
 
 99
 In order to obtain certification of a class under Rule 23, the moving party must establish not only that the putative class satisfies all four requirements of section (a), discussed above, but also that it fits within at least one of the categories specified in section (b). In re Drexel, 960 F.2d at 290. As the district court found, this case fits within subsection (b)(3), which states:
 
 
 100
 [A]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:
 
 
 101
 (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to any other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.
 
 
 102
 We agree with the district court's evaluation. The interest of any one party in controlling the defense is minimal, and any designated class representative could have declined to serve upon a showing of good cause. No litigation of this controversy is currently pending elsewhere, and it would be in the interest of judicial economy to litigate in one forum the narrow issue of the proper method of determining true market value.
 
 
 103
 The true market value of Conrail's properties hinges largely on the proper method for determining it, and this presents issues common to every class member. Litigating in one forum would adequately serve the interests of all 700 taxing jurisdictions instead of repeatedly litigating the same issue and possibly getting conflicting results.
 
 
 104
 Conrail asserts that the class certification also meets the criteria under F.R.C.P. 23(b)(1) and (2). However, it is not necessary to consider these claims since F.R.C.P. 23(b) requires satisfaction of only one.
 
 
 105
 We have considered the other arguments advanced by the defendants and find them to be without merit.
 
 CONCLUSION
 
 106
 Since the district court did not abuse its discretion when it granted the motion for a preliminary injunction and certified the defendant class, we affirm both orders.