**CHICAGO AND NORTH WESTERN TRANSPORTATION COMPANY, n/k/a Chicago and North Western Railway Company, Plaintiff,**

v.

**WEBSTER COUNTY BOARD OF SU-PERVISORS, as Trustees for Webster County Drainage Districts 197, 197 Branch 2, 106, 64, 89, and 225, Defendant.**

No. C 93–3070.

United States District Court,
N.D. Iowa,
Central Division.

March 22, 1995.

Robert B. DePugh, pro se.

G. Daniel Gildemeister of Gildemeister, Willia & Keane, Sioux City, IA, for defendant.

**MEMORANDUM OPINION AND ORDER ON THE PARTIES' CROSS–MOTIONS FOR SUMMARY JUDGMENT**

BENNETT, District Judge.

TABLE OF CONTENTS

I. INTRODUCTION ................................................... 1292
   A. Procedural Background ............................................. 1292
   B. Factual Background ............................................... 1293

II. STANDARDS FOR SUMMARY JUDGMENT ............................ 1294

III. LEGAL ANALYSIS ............................................... 1295
   A. Iowa Code Provisions .............................................. 1295
   B. The "4–R Act" .................................................... 1297
      1. Purpose of the "4–R Act" ...................................... 1297
      2. § 306's prohibitions ......................................... 1298
      3. The relief provided under the 4–R Act .......................... 1299
   C. Iowa Code Ch. 468 And The 4–R Act ................................ 1300
      1. Does Iowa Code Ch. 468 impose a "tax" upon the Railroad? ......... 1300
         a. The Union Pacific test of what is a tax ...................... 1301
         b. An alternative test of what is a tax ......................... 1302
            i. Legislative authority ...................................... 1302
            ii. Raising revenue ......................................... 1303
            iii. Similarly situated persons ................................ 1303
            iv. Public Benefit .......................................... 1303
         b. Application of the tests ..................................... 1306
      2. Is any "tax" imposed "discriminatory"? ......................... 1308

III. CONCLUSION ................................................... 1310

The threshold issue in this litigation illustrates one of life's basic truths: it is often the simple questions that are the hardest to answer. Examples abound. The small child asks, "Why is the sky blue?" The poet inquires, "What is love?" The physicist queries, "What is the smallest particle?" Here, in this otherwise rather ordinary dispute between a municipal drainage district and a railroad, the penetrating question raised is, "What is a tax?" The court has found the quest for an answer to the question posed here to be surprisingly disconcerting.

A railroad filed this lawsuit for declaratory and injunctive relief from efforts of a county board of supervisors, as trustees for several drainage districts, to recover the costs of building or rebuilding a culvert over a drain that crossed the railroad's right-of-way. The board had instituted a lawsuit in Iowa state court to recover the building costs involved pursuant to provisions of Iowa Code Ch. 468. Those proceedings in state court have been stayed. In this federal lawsuit, the railroad asserts that the actions of the board, if permitted, would allow imposition of a "discriminatory tax" upon the railroad in violation of § 306 of the Railroad Revitalization and Regulatory Reform Act (the "4–R Act"), 49 U.S.C. § 11503. The railroad's lawsuit requires the court to answer two questions: (1) whether or not the actions of the board pursuant to Iowa Code Ch. 468 seek to impose a "tax" upon the railroad, and (2) if a "tax" is involved, whether or not it is "discriminatory," and thus in violation of § 306 of the 4–R Act. The court has found substantial merit on both sides of these two questions and thus their resolution has been unusually difficult.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Chicago and North Western Transportation Company (CNW or the Railroad), formerly known as Chicago and North Western Railway Company, filed this lawsuit for declaratory and injunctive relief on October 15, 1993. The defendant is the Webster County Board of Supervisors (the Board), acting as trustees for Webster County Drainage Districts 197, 197 Branch 2, 101, 65, 89, and 225.[1] The Board filed suit in Iowa District Court for Webster County on June 14, 1993, pursuant to provisions of Iowa Code Ch. 468 seeking to recover from CNW $108,-314.85 expended by the Board to build an improvement to a drain and culvert on CNW's right-of-way. The state court action has been stayed. In this federal action, CNW seeks declaratory judgment that the Board's efforts to recover the costs of building the culvert and drainage improvements constitute a discriminatory tax in violation § 306 of the Railroad Revitalization and Regulatory Reform Act (the "4–R Act"), 49 U.S.C. § 11503. CNW also seeks an injunction preventing any further attempts by the Board to recover the costs of building the culvert and drainage improvements. The Board answered the complaint in this matter on December 13, 1993.

The parties entered into a joint stipulation of facts, which was filed on October 31, 1994. On November 16, 1994, CNW moved for summary judgment on the ground that, as a matter of law, the Board's efforts to recover from the Railroad the costs of building the drainage improvements and culvert constitute efforts to impose a discriminatory tax in violation of § 306 of the 4–R Act. The Railroad argues that the effort to recover costs is a "tax," because the costs collected are not used to defray the expense of regulating railroads, something the Board is not authorized to do in any event, but solely for the purpose of reimbursing the drainage district for providing the general service of controlling drainage water flow for all property owners within the district. The Railroad argues further that no other private property owner, including any other owner of "com-

---

1. Although the captions on all filings and the complaint itself identify drainage district 225 as one of the relevant drainage districts, the joint stipulation of facts filed by the parties lists instead drainage district 255 both times the drainage districts are identified. The court assumes

that one or the other of these identifications is a typographical error, which, although in no way dispositive of the legal issues involved, should be corrected in the interests of rendering judgment against proper parties.

mercial and industrial property," is required to make or pay for similar drainage district improvements without reimbursement.

The Board resisted CNW's motion for summary judgment on December 19, 1994, and also cross-moved for summary judgment in its favor. The Board argues that its efforts to recover construction costs and the provisions of the Iowa Code under which it is seeking those costs neither impose a tax on nor discriminate against the Railroad. The Board argues that the obligation imposed upon the Railroad is the same as that imposed upon any other owner of a surface right-of-way, that is, to build culverts and bridges over drains at the right-of-way owner's expense. Furthermore, the Board argues, the recovery of construction costs is not a "tax," because none of the costs recovered go into a general revenue fund, but instead are used only to pay for construction that should have been done or paid for by the railroad.

CNW resisted the cross-motion for summary judgment on December 30, 1994. The Board filed a supplemental brief on January 9, 1995, and CNW responded to that brief on January 17, 1995. The court held oral arguments on the cross-motions for summary judgment in Fort Dodge, Iowa, on March 10, 1995. CNW was represented at the oral arguments by Stephen P. DeVolder of Lewis, Webster, Johnson, Van Winkle & DeVolder, in Des Moines, Iowa. The Board was represented by James L. Kramer and Susan Ahlers of Johnson, Erb, Bice & Carlson, P.C., in Fort Dodge, Iowa. Both the briefing and the spirited oral argument were of exceptional quality. Counsel are commended for the superb advocacy. This matter is now fully submitted.

## B. Factual Background

The parties have stipulated that the following facts are true and are admitted for any and all purposes of this lawsuit. The court therefore regards these facts as undisputed. CNW is a Delaware corporation with its principal place of business in the State of Illinois. It is an interstate common carrier by railroad, and is duly qualified to do business and does business in the State of Iowa. It is subject to the jurisdiction of the Interstate Commerce Commission under Subchapter I of Chapter 105 of Title 49, United States Code. Defendant Webster County Board of Supervisors acts as trustee for Webster County Drainage Districts 197, 197 Branch 2, 106, 64, 89, and 255, which are duly recognized subdivisions of the State of Iowa.

In formal action taken on January 7, 1992, the Board undertook to make repairs and improvements to the listed Drainage Districts within the City of Gowrie, Webster County, Iowa.[2] The railroad's right-of-way crosses the drain of Drainage District 197, 197 Branch 2, 106, 64, 89, and 255 within the City of Gowrie, Webster County, Iowa. On January 27, 1992, the Board caused to be served on the railroad an Iowa Code § 489.109 notice.[3] The notice directed the railroad to, within 30 days, build or rebuild a culvert across the right-of-way in the manner specified by the Board.

Under Iowa law, the railroad was required to build or rebuild the culvert within the time specified by Iowa Code § 468.110, and the cost was to be borne by the railroad by operation of Iowa Code § 468.111. The railroad contends that these provisions do not apply because of federal law. The railroad did not build or rebuild the culvert. The Board caused the culvert to be built or rebuilt under the supervision of the engineer in charge of the improvement. The Board acted under authority of Iowa Code § 468.112. The fair and reasonable cost of this improve-

2. On March 10, 1995, at the hearing on these motions, the parties presented to the court a supplemental joint stipulation of facts consisting of three maps showing the drainage project and the two crossings of new culvert across the Railroad's right of way. That supplemental joint stipulation of facts was filed on March 14, 1995.

3. The court also presumes that reference to § 489.109 in the joint stipulation of facts is another typographical error. There is no Chapter 489 in the Iowa Code. However, Iowa Code § 468.109 provides for notice to railroads of drainage improvements to be constructed across railroad rights-of-way. Therefore, the court concludes that the notice provided by the Board was under the authority of Iowa Code § 468.109, rather than Iowa Code § 489.109, the nonexistent code section.

ment was $108,314.85. The railroad contends that it is entitled to certain offsets from this amount if state law does apply.

On June 14, 1993, the Board filed a petition at law in the Iowa District Court for Webster County against the railroad. The Board sought from the railroad the money the Board had expended to build or rebuild the culvert. The Board based its claim on Iowa Code § 468.112. The state court action subsequently was stayed pending further order of that court.

On October 15, 1993, the railroad filed with the federal court its "complaint for injunctive and declaratory relief." The complaint is based on Section 306 of the Railroad Revitalization and Regulatory Reform Act, 49 U.S.C. § 11503. The section prohibits a state, subdivision of a state, or authority acting for a state or subdivision of a state from imposing a discriminatory tax against an interstate rail carrier under the circumstances defined in the act. In its complaint, the railroad contends that the amount sought by the Board in its state law action is based on a discriminatory tax proscribed by Section 306.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–Inini,* 900 F.2d at 1238 (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986)); *Hartna-*

*gel v. Norman,* 953 F.2d 394, 396 (8th Cir. 1992).

The standard for granting summary judgment is well established. *Rule* 56 of the Federal Rules of Civil Procedure states in pertinent part:

Rule 56. Summary Judgment

(a) For Claimant. A party seeking to recover upon a claim, counterclaim, or cross-claim or to obtain a declaratory judgment may, at any time after the expiration of 20 days from the commencement of the action or after service of a motion for summary judgment by the adverse party, move with or without supporting affidavits for a summary judgment in the party's favor upon all or any part thereof.

(b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.

(c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(a), (b), & (c) (emphasis added); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir.1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir.1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)). A court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986) (quoting *United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)); *Munz v. Michael,*

28 F.3d 795, 796 (8th Cir.1994); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir.1994); *Johnson v. Group Health Plan, Inc.*, 994 F.2d 543, 545 (8th Cir.1993); *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Coday v. City of Springfield, Mo.*, 939 F.2d 666, 667 (8th Cir.1991), *cert. denied*, 502 U.S. 1094, 112 S.Ct. 1170, 117 L.Ed.2d 416 (1992). Because the parties have stipulated to the facts, the question here is solely whether either moving party is entitled to judgment as a matter of law on its cross-motion for summary judgment. *Fed.R.Civ.P.* 56(c). In order to make this determination, the court must consider the relevant provisions of both the 4–R Act and Iowa Code Ch. 468.

### III. LEGAL ANALYSIS

### A. Iowa Code Provisions

The Board asserts that its actions were taken in compliance with Iowa Code §§ 468.109–112. The purpose of establishing and maintaining drainage districts in Iowa was to provide for construction of proper drainage facilities "whenever the same will be of public utility or conducive to the public health, convenience, or welfare." Iowa Code § 468.1. Iowa Code § 468.109 provides for the appropriate notice from the board requiring construction of drainage system improvements that cross railroad rights-of-way:

> Whenever the board of supervisors shall have established any levee, or drainage district, or change of any natural watercourse and the levee, ditch, drain, or watercourse as surveyed and located crosses the right of way of any railroad company, the county auditor shall immediately cause to be served upon such railroad company, in the manner provided for the service of original notices, a notice in writing stating the nature of the improvement to be constructed, the place where it will cross the right of way of such company, and the full requirements for its complete construction across such right of way as shown by the plans, specifications, plat, and profile of the engineer appointed by the board, and directing such company to construct such improvement according to said plans and specifications at the place designated, across its right of way, and to build and

construct or rebuild and reconstruct the necessary culvert or bridge where any ditch, drain, or watercourse crosses its right of way, so as not to obstruct, impede, or interfere with the free flow of the water therein, within thirty days from the time of the service of such notice upon it.

Iowa Code § 468.109. Iowa Code § 468.110 imposes upon the railroad company the duty to construct the improvement as required:

> Upon receiving the notice provided in section 468.109, such railroad company shall construct the improvement across its right of way according to the plans and specifications prepared by the engineer for said district, and build or rebuild the necessary culvert or bridge and complete the same within the time specified.

Iowa Code § 468.110.

■ Three provisions of Iowa Code Ch. 468 govern the imposition of costs of construction of culverts or bridges over drainage system improvements upon the railroad. First, Iowa Code § 468.111 provides that

> the cost of building, rebuilding, constructing, reconstructing, changing, or repairing, as the case may be, any culvert or bridge, when such improvement is located at the place of the natural waterway or place provided by the railroad company for the flow of the water, shall be borne by such railroad company without reimbursement therefor.

Iowa Code § 468.111. A fair reading of this provision is that only the cost of the culvert or bridge, and not the cost of the entire improvement where it crosses the right-of-way, is imposed upon the railroad.

The Iowa code contemplates the possibility that a railroad will fail to undertake the necessary construction as follows:

> If the railroad company shall fail, neglect, or refuse to comply with said notice, the board shall cause the same to be done under the supervision of the engineer in charge of the improvement, and such railroad company shall be liable for the cost thereof to be collected by the county for said district in any court having jurisdiction.

Iowa Code § 468.112. Although § 468.112 provides that the board's cause of action is for the cost of the entire *improvement,* § 468.113 provides either a defense or a set-off of "damages" to the railroad against the imposition of the costs of the entire improvement:

The cost of constructing the improvement across the right of way of such company, not including the cost of building or rebuilding and constructing or reconstructing any necessary culvert or bridge, when such improvement is located at the place of the natural waterway or place provided by the railroad company for the flow of the water, shall be considered as an element of such company's damages by the appraiser of damages.

Iowa Code § 468.113. Thus, § 468.113 confirms in explicit language the court's reading of § 468.111, because it provides that ultimately the railroad bears only the cost of the culvert or bridge, which is the only portion of the drainage improvement that accrues solely to the benefit of the railroad.

Because there is remarkably little case law from the Iowa Supreme Court interpreting these provisions of Iowa Code Ch. 468, the court believes that a summary of the meaning of these provisions will be particularly helpful. As the court reads the statutory provisions, Iowa Code § 468.109 authorizes the board to notify a railroad company of necessary improvements for the drainage district that cross railroad rights-of-way, and to direct the railroad company to build such improvements. Iowa Code § 468.110 imposes upon railroads an affirmative duty to construct such improvements, and additionally, to build or rebuild the necessary culverts or bridges to carry the railroad's roadbed over the improvement. If the railroad company refuses to fulfill its duty, the board may, under Iowa Code § 468.112, cause the work to be done, and then seek to recover the costs of the construction of the entire improvement, including the culvert or bridge, from the railroad in an action in Iowa district court. However, both Iowa Code § 468.111 and § 468.113 make it clear that the railroad company shall ultimately bear the full costs only of building or rebuilding the bridge or

culvert necessary to carry its roadbed over the improvement. This is so, because Iowa Code § 468.111 imposes only the costs of "any culvert or bridge" upon the railroad, and § 468.113 states that the costs of the improvement "not including the cost" of the bridge or culvert shall be damages to the railroad set off by the appraiser of damages against the full construction costs of the entire improvement.

What little Iowa case law concerning these code provisions can be found, none of it recent and, thus, all of it antedating the enactment of the 4–R Act in 1976, nonetheless serves only to confirm the court's conclusions. In *Chicago & N.W. Ry. Co. v. Drainage District No. 5, Sac County,* 142 Iowa 607, 121 N.W. 193 (1909), the Iowa Supreme Court held that the term "improvement" referred to a "levee, ditch, drain," etc., but the code "does not provide for the cost of constructing a new bridge as an element of damages in plaintiff's favor," even where construction of the bridge was necessitated by making the "improvement" to the drainage system. *Chicago & N.W. Ry. Co.,* 142 Iowa at 613, 121 N.W. at 195. This point was also made in *Mason City & Ft. Dodge R. Co. v. Board of Supervisors of Wright County,* 144 Iowa 10, 121 N.W. 39 (1909), in which the court observed, "To what, then, do the words 'the improvement' [in current §§ 468.110, 468.111, and 468.113] refer? Manifestly, 'the ditch.'" *Mason City & Ft. Dodge R. Co.,* 144 Iowa at 16, 121 N.W. at 41. The court held that "the cost of extending the ditch across the right of way, and not the constructing or reconstructing of culverts or bridges rendered necessary because of this being done and their maintenance forever, is the element of damages contemplated by the statute." *Id.; see also Chicago, R. I. & P. Ry. Co. v. Board of Supervisors of Washington County,* 196 Iowa 370, 194 N.W. 266 (1923) (plaintiff railroad could not recover cost of constructing or maintaining necessary bridge across drainage ditch).

The Eighth Circuit Court of Appeals long ago concurred in this distinction between the costs of the improvement, i.e., the drainage ditch, which are the railroad's damages, and the costs of the bridge or culvert necessary

for the maintenance of the railroad's right-of-way, which are costs borne by the railroad. *See Chicago B. & Q. R. Co. v. Board of Supervisors of Appanoose County*, 182 F. 291, 294 (8th Cir.1910) ("The Supreme Court of Iowa, in *Mason City & Ft. Dodge R.R. Co. v. Board of Supervisors*, 121 N.W. 39, and *Chicago & N.W. Ry. Co. v. Drainage Dist. No. 5*, 121 N.W. 193 had before it the identical question which is here presented, and it was there ruled that a railroad company is not entitled to recover the expense of building a new bridge over a public drainage ditch, but that its damages are confined to the value of the easement across its right of way. These cases followed the decision of the Supreme Court of the United States in *[Chicago,] Burlington & Quincy R.R. Co. v. [State of Ill. ex re. Grimwood,] Drainage Commissioners*, 200 U.S. 561, 26 Sup.Ct. 341, 50 L.Ed. 596 [ (1906) ], where a similar rule was enforced. The trial court was clearly right in following these decisions as a binding declaration of law."). This decision also affirmed the prior decision in the case, upholding the constitutionality of not allowing a railroad damages for a bridge necessary to cross a drainage ditch on the ground that the state has the right in the exercise of its police powers, for the purposes expressed in the act providing for drainage improvements, to impose the expense or burdens on property without the allowance of an equivalent by way of damages. *Chicago B. & Q. R. Co. v. Board of Supervisors of Appanoose County*, 170 F. 665. (1908).

In *United States R. Admin. v. Board of Supervisors of Buena Vista County*, 196 Iowa 309, 194 N.W. 365 (1923), the Iowa Supreme Court held that a highway bridge was a necessary part of a drain improvement, and even though it provided some special benefit to the railroad, the railroad could not be assessed for the costs of the bridge, because the bridge was part of the necessary improvement, and its cost should have been apportioned in the assessment of benefits of the entire improvement. *United States R. Admin.*, 196 Iowa at 310, 194 N.W. at 366. However, the court does not read this case to stand for the proposition that any bridge or culvert is part of the general improvement to the drain. Rather, a bridge for a *public*

highway not on the railroad's right-of-way was part of the general improvement. The Iowa Attorney General has concluded that the board of supervisors has no duty to maintain a *private* bridge over a drainage ditch, as the cost of a private bridge and its maintenance are part of the damages taken into consideration when a drainage district is established. Op.Atty.Gen. 1919–20, p. 336.

The court must next consider whether the provisions of the Iowa code imposing upon a railroad the cost of building a bridge or culvert on its right-of-way to cross a drainage ditch impose a "discriminatory tax" upon railroads in violation of the 4–R Act.

### B. The "4–R Act"

■ CNW asserts that the provisions of Iowa law above violate provisions of the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4–R Act"), Pub.L. 94–210, 90 Stat. 31. CNW asserts that the Iowa code provisions violate § 306 of the 4–R Act, codified at 49 U.S.C. § 11503, by imposing a "tax" that is "discriminatory" towards railroads, and therefore application of those provisions in this case must be enjoined. The court must therefore consider the purpose of § 306 of the 4–R Act and whether the Iowa code provisions in question violate the federal Act.

### 1. Purpose of the "4–R Act"

■ Congress enacted the "4–R Act" in part to "restore the financial stability of the railway system of the United States." § 101(a), 90 Stat. 33; *Department of Revenue of Oregon v. ACF Indus., Inc.*, — U.S. —, —, 114 S.Ct. 843, 846, 127 L.Ed.2d 165 (1994); *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473 (2d Cir.1995) ("The purpose of the [4–R Act] was to 'provide the means to rehabilitate and maintain the physical facilities, improve the operations and structure, and restore the financial stability of the railway system of the United States,'" citing Pub.L. 94–210 § 101(a); *Burlington Northern R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 457, 107 S.Ct. 1855, 1857, 95 L.Ed.2d 404 (1987); *Cuyahoga Valley Ry. Co. v. Tracy*, 6 F.3d 389, 393 (6th

Cir.1993) (quoting the same purpose, but citing 45 U.S.C. § 801(a)); *Union Pacific R. Co. v. Public Utility Comm'n of State of Oregon*, 899 F.2d 854, 857 (9th Cir.1990)).[4]

One impediment to the financial stability of railroads in the United States was discriminatory taxation. *Cuyahoga Valley Ry. Co.*, 6 F.3d at 393; *Union Carbide Corp. v. State Bd. of Tax Comm'rs of State of Ind.*, 992 F.2d 119, 121 (7th Cir.1993) (quoting H.R.Rep. No. 725, 94th Cong., 1st Sess. 78 (1975), which suggested that "railroads are 'over-taxed by at least $50 million each year'"); *Union Pacific R. Co.*, 899 F.2d at 857. Congress concluded that "[i]n view of the generally poor economic condition of the railroad industry and the effect such economic hardship is having on the ability of the industry to adequately serve our national rail transportation needs, ... discriminatory property and 'in lieu' taxation should be ended." H.R.Rep. No. 725, 94th Cong., 1st Sess. 78 (1975); *Cuyahoga Valley Ry. Co.*, 6 F.3d at 393.

The Supreme Court has developed this theme, noting that

[w]hen drafting the legislation, Congress was aware that railroads "'are easy prey for State and local tax assessors' in that they are 'nonvoting, often nonresident, targets for local taxation.' who cannot easily remove themselves from the locality." *Western Air Lines, Inc. v. Board of Equalization*, 480 U.S. 123, 131, 107 S.Ct. 1038, 1042, 94 L.Ed.2d 112 (1987) (quoting S.Rep. No. 91–630, p. 3 (1969)). Section 306 of the 4–R Act, now codified at 49 U.S.C. § 11503, addresses this concern by prohibiting the States (and their subdivisions) from enacting certain taxation schemes that discriminate against rail-

roads. *See Burlington Northern R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 457, 107 S.Ct. 1855, 1858, 95 L.Ed.2d 404 (1987).

*ACF Indus.*, —— U.S. at ——, 114 S.Ct. at 846. When considering the question of the purpose of similar provisions of the Airport and Airway Improvement Act of 1982 (AAIA), the Court delved further into the congressional concern with discriminatory treatment of interstate carriers by state and local taxing authorities:

Section 1513(d) [of the AAIA] is modeled on similar provisions in the 4–R Act and the Motor Carrier Act of 1980. See 49 U.S.C. § 11503, 11503a. The legislative history of the antidiscrimination provisions in the 4–R Act demonstrates Congress' awareness that interstate carriers "are easy prey for State and local tax assessors[.]" .... The Department of Transportation had observed that "[s]tate and local governments derive substantial revenues from taxes on property owned by common carriers." [S.Rep. No. 91–630], at p. 4. It is this temptation to excessively tax nonvoting, nonresident businesses in order to subsidize general welfare services for state residents that made federal legislation in this area necessary.

*Western Air Lines v. Board of Equalization of State of South Dakota*, 480 U.S. 123, 131, 107 S.Ct. 1038, 1043, 94 L.Ed.2d 112 (1987). The court turns next to the question of what is forbidden by the section of the 4–R Act in question here.

### 2. § 306's prohibitions

The provisions of the 4–R Act in question here are found in § 306 of the Act.[5] The

---

**4.** Another concern addressed by the 4–R Act was the loss of trackage, which prompted Congress to include in the Act several provisions aimed at promoting the conversion of abandoned rail lines into trails. *Preseault v. Interstate Commerce Comm'n*, 494 U.S. 1, 5–6, 110 S.Ct. 914, 918–19, 108 L.Ed.2d 1 (1990) (citing the relevant provisions to be § 809 of the 4–R Act, Pub.L. 94–210, 90 Stat. 144, as amended, 49 U.S.C. § 10906).

**5.** The Eighth Circuit Court of Appeals has made the following observations about the codification of § 306 of the 4–R Act:

Section 306 of the 4–R Act was originally codified at 49 U.S.C. § 26c (1976), but was later recodified, with slight changes in language, at 49 U.S.C. § 11503 under an Act of Oct. 17, 1978, Pub.L. No. 95–473, § 11503, 92 Stat. 1337, 1445–46. The revising act, however, declared that its provisions merely "restate" existing laws and "may not be construed as making a substantive change in the laws replaced." *Id.* § 3(a), 92 Stat. at 1466. As such, the language of section 306 is still controlling and we find it most convenient simply to refer to section 306 in [our] opinion[s].

pertinent provisions of § 306, as codified at 49 U.S.C. § 11503(b), are as follows:

"The following acts unreasonably burden and discriminate against interstate commerce, and a State, subdivision of a State, or authority acting for a State or subdivision of a State may not do any of them:

(1) assess rail transportation property at a value that has a higher ratio to the true market value of the rail transportation property than the ratio that the assessed value of other commercial and industrial property in the same assessment jurisdiction has to the true market value of the other commercial and industrial property.

(2) levy or collect a tax on an assessment that may not be made under clause (1) of this subsection.

(3) levy or collect an ad valorem property tax on rail transportation property at a tax rate that exceeds the tax rate applicable to commercial and industrial property in the same assessment jurisdiction.

(4) impose another tax that discriminates against a rail carrier providing transportation...."

49 U.S.C. § 11503(b).[6] The Supreme Court considered the reach of these provisions in *ACF Indus.:*

The reach of subsections (b)(1)–(3) is straightforward: These provisions forbid the imposition of higher assessment ratios or tax rates upon rail transportation property than upon "other commercial and industrial property." The scope of subsection (b)(4), which forbids the imposition of "another tax that discriminates against a rail carrier providing transportation," is not as clear.

*ACF Indus.,* — U.S. at ——–——, 114 S.Ct. at 846–47. Unfortunately, the court agrees with the parties that it is under this fourth subsection, with its uncertain scope, that the present controversy falls, because there is no "property tax" involved here.[7]

### 3. The relief provided under the 4–R Act

The 4–R Act provides for injunctive and declaratory relief in what was originally § 306(2):

The original Section 306(2) expressly conferred jurisdiction on United States district courts "to grant such mandatory and prohibitive injunctive relief, interim equitable relief, and declaratory judgments as may be necessary to prevent, restrain, or terminate" any violations of the section. Since language changes that have occurred were not intended to be substantive, the recodification of § 306(2) at § 11503(c) also grants the authority to district courts to issue injunctive relief to prevent or terminate violations of § 11503(b). *Atchison, T. & S.F. Ry. v. Lennen,* 640 F.2d 255 (10th Cir.1981). Section 11503(c) is an exception to the Tax Injunction Act, 28 U.S.C. § 1341 (1988), which provides that federal district courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." *See also Burlington Northern R.R. v. Department of Revenue,* 934 F.2d 1064, 1067 (9th Cir. 1991).

*CSX Transp., Inc. v. Tennessee Bd. of Equalization,* 964 F.2d 548, 550 (6th Cir.1992); *see*

---

*Burlington Northern R. Co. v. Bair,* 957 F.2d 599, 600 n. 1 (8th Cir.1992); *Trailer Train Co. v. State Tax Comm'n,* 929 F.2d 1300, 1302 n. 3 (8th Cir.1991) ("we use the language of Section 306, even though its codified version at 49 U.S.C. § 11503 is different," citing *Trailer Train Co. v. Leuenberger,* 885 F.2d 415, 416 n. 2 (8th Cir. 1988), *cert. denied,* 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989); *Ogilvie v. State Bd. of Equalization,* 657 F.2d 204, 206 n. 1 (8th Cir.), *cert. denied,* 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981)).

**6.** The language of the fourth subsection of § 306(2) of the 4–R Act, as opposed to its codified form in § 11503(b)(4), is as follows: "It is

unlawful for a State ... to commit any of the following prohibited acts ... (d) The imposition of any other tax which results in discriminatory treatment of a common carrier by railroad subject to this part." 90 Stat. at 54; *Trailer Train Co.,* 929 F.2d at 1302.

**7.** The Fourth Circuit Court of Appeals shed some light on what is *not* within the scope of § 306's prohibitions when it held that § 306 does not provide a basis for parties to challenge a state's preferred accounting method. *Chesapeake Western Ry. v. Forst,* 938 F.2d 528, 530 (4th Cir.1991), *cert. denied,* 503 U.S. 966, 112 S.Ct. 1577, 118 L.Ed.2d 220 (1992).

also *Consolidated Rail Corp.*, 47 F.3d at 478–79 (4–R Act provides for injunctive relief).

A railroad seeking statutorily authorized injunctive relief from alleged tax discrimination under the 4–R Act thus is not governed by the equitable criteria generally applied to granting injunctions. *Consolidated Rail Corp.*, 47 F.3d at 478–79; *Burlington Northern R. Co. v. Bair*, 957 F.2d 599, 601 (8th Cir.1992) (rejecting application of the usual equitable criteria found in *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109 (8th Cir.1981),[8] and citing *Lennen*, 640 F.2d at 260, and *Trailer Train Co. v. State Bd. of Equalization*, 697 F.2d 860, 869 (9th Cir.), *cert. denied*, 464 U.S. 846, 104 S.Ct. 149, 78 L.Ed.2d 139 (1983), as stating the proper "reasonable cause" standard), *cert. denied*, —— U.S. ——, 113 S.Ct. 69, 121 L.Ed.2d 36 (1992); *Burlington Northern R. Co. v. Department of Revenue of State of Wash.*, 934 F.2d 1064 (9th Cir.1991). Instead, the railroad must only demonstrate that a violation of the 4–R Act has occurred or is about to occur. *Consolidated Rail Corp.*, 47 F.3d at 478–79; *CSX Transp.*, 964 F.2d at 551. This is not to say that the "mere possibility" of a violation is enough; rather, "a party must establish, to the satisfaction of the district court acting within its discretion, a *reasonable probability* that a violation of the Act has occurred or will occur." *CSX Transp.*, 964 F.2d at 555 (emphasis added); *Bair*, 957 F.2d at 601 (describing this as a "reasonable cause" standard).[9]

## C. Iowa Code Ch. 468 And The 4–R Act

To determine whether the provisions of Iowa Code Ch. 468 at issue here run afoul of the prohibitions of § 306 of the 4–R Act, the court must first answer the question, "Do these Iowa code provisions impose a 'tax' upon the railroad?" The court must then consider another question, "Is any 'tax' imposed 'discriminatory'?" Only if the answer to both questions is yes does the scheme in the Iowa code violate § 306 of the 4–R Act, requiring the court to order declaratory and injunctive relief barring the Board from further pursuit of its state court action under the statutory scheme.

### 1. Does Iowa Code Ch. 468 impose a "tax" upon the Railroad?

The court concluded above that the provisions of Iowa Code Ch. 468 impose a "tax," if at all, only if they impose a "tax" within the meaning of subsection (b)(4). Courts have treated subsection (b)(4) as a "catch-all section" to extend the reach of § 306 beyond taxes that are specifically property taxes. *Burlington Northern R. Co. v. City of Superior, Wis.*, 932 F.2d 1185, 1186 (7th Cir.1991) ("Subsection (b)(4) is a catch-all designed to prevent the state from accomplishing the forbidden end of discriminating against railroads by substituting another type of tax. It could be an income tax, a gross-receipts tax, a use tax, an occupation tax as in this case—whatever."). Similarly, the Eighth Circuit Court of Appeals has found that the inclusion of subsection (b)(4) means that "Section 306 ... forbids all taxes that discriminate against railroads (not just discriminatory property taxes)...." *Trailer Train Co. v. State Tax Comm'n*, 929 F.2d 1300, 1302 (8th Cir.), *cert. denied*, 502 U.S. 856, 112 S.Ct. 169, 116 L.Ed.2d 133 (1991). The court finds that

---

**8.** The most recent formulation of the *Dataphase* standards is as follows:

> When considering a motion for a preliminary injunction, a district court weighs the movant's probability of success on the merits, the threat of irreparable harm to the movant absent the injunction, the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and the public interest. *Dataphase Sys., Inc. v. CL Sys., Inc.*, 640 F.2d 109, 114 (8th Cir.1981) (*en banc*). We reverse the issuance of a preliminary injunction only if the issuance "is the product of an abuse of discretion or misplaced reliance on an erroneous legal premise." *City*

of Timber Lake v. Cheyenne River Sioux Tribe, 10 F.3d 554, 556 (8th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2741, 129 L.Ed.2d 861 (1994).

*Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir.1994)

**9.** The court notes further that where a railroad has been found by a federal court to have been subjected to a discriminatory tax in violation of the 4–R Act, the Iowa Supreme Court has held that the railroad may seek to recover a refund via an action for mandamus. *Burlington Northern R. Co. v. Board of Supervisors of Adair County*, 418 N.W.2d 72, 74 (Iowa 1988).

although it is a simple matter to ask what is a 'tax,' it is a surprisingly difficult process to develop an analytical process that satisfactorily answers the question.

This court shares with the District of Columbia Circuit Court of Appeals its concern that "[t]he definition of 'tax' in the abstract is a metaphysical exercise in which courts do not have occasion to engage. The term comes before judges embedded in legal contexts from which the word gains concrete and specific meaning." *Brock v. Washington Metropolitan Area Transit Auth.*, 796 F.2d 481, 489 (D.C.Cir.1986) (concluding that, in the context of the legislation in question and the tax immunity doctrine it was said to violate, transit authority did not enjoy tax immunity from contribution to a special fund from which the Secretary of Labor made a variety of payments to injured workers), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987). The court therefore turns to an examination of the legal contexts in which the term "tax" is embedded.

### a. The Union Pacific test of what is a tax

The parties point to the decision of the Ninth Circuit Court of Appeals in *Union Pacific R. Co. v. Public Utility Comm'n*, 899 F.2d 854 (9th Cir.1990), as providing the test or inquiry for determining whether or not a state is seeking to impose a "tax" within the meaning of § 306 upon a railroad. In *Union Pacific*, the court considered whether a levy with the following characteristics could be a "tax" subject to § 306's prohibitions if discriminatory:

> [T]he levy at issue is an integral part of a program to regulate the railroad business in Oregon. It is imposed only upon those who participate in and profit from the business regulated. It is paid directly to the Commission and does not go into Oregon's general fund; it produces no revenues for the general expenses of government but is devoted exclusively to defraying the costs of the regulatory program itself.

*Id.* at 857. In concluding that the levy in question was not a "tax" within the meaning of § 306, the court considered, first, "the primary purpose of the contested levy and

the primary purpose of the provision it was said to violate." *Id.* at 858 (citing the *Head Money Cases (Edye v. Robertson)*, 112 U.S. 580, 5 S.Ct. 247, 28 L.Ed. 798 (1884)). The court concluded that "a levy to collect the costs of regulation from those regulated is not to be treated as a tax. . . ." *Id.* at 859 (citing *State of South Carolina ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir.1983), *cert. denied*, 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984), and the rationale of the *Head Money Cases*). The court concluded further " 'that a levy is properly defined as a 'tax' . . . when its principal purpose is to raise revenues, not to regulate activities.' " *Id.* at 859 (quoting *Brock v. Washington Metropolitan Area Transit Auth.*, 796 F.2d 481, 488 (D.C.Cir.1986), *cert. denied*, 481 U.S. 1013, 107 S.Ct. 1887, 95 L.Ed.2d 494 (1987)).

While the parties are certainly to be applauded for finding case law that appears to address the specific question raised by the case, i.e., what is a "tax" within the meaning of § 306, the court finds application of the *Union Pacific* inquiry here, and the arguments of the parties concerning the application and results of that test, necessarily strained, because the costs imposed by the Iowa code provisions in question bear little or no resemblance to the "levy" authorized by the Oregon statute in *Union Pacific* or the *Head Money Cases* to which the Ninth Circuit Court of Appeals refers. Nothing in the Iowa code provisions at issue authorizes any board of supervisors, as the trustees for a drainage district, to make a per capita or per item or per service levy on a railroad. Nor is there any "fee," another possible form of "taxation" considered in the *Union Pacific* case. *Union Pacific*, 899 F.2d at 859. Nor is there any imposition of an income tax, a gross-receipts tax, a use tax, or an occupation tax. *City of Superior, Wis.*, 932 F.2d at 1186. Rather, the Iowa code provisions provide that, where a railroad fails to build a culvert or bridge necessary for the railroad right-of-way to cross a drainage ditch, the board of supervisors has a cause of action against the railroad to recover construction costs it incurs in building that culvert or bridge.

The Railroad argues that the "tax" is the effect of these code provisions, which is that the Railroad must pay the costs of building a bridge or culvert necessary to cross a drainage ditch. The Railroad likens this to the "assessment" of the costs of the improvement against all benefitted property owners, which the court agrees is a form of taxation. The Railroad argues that it, and only it, is required to bear the part of the "assessment" for the "improvement" that represents the costs of the culvert or bridge. The answer to this argument is to refer to the Iowa cases holding that the culvert or bridge is simply not part of the "improvement" to the drainage system; only the ditch, drain, or levee is part of the improvement. The Railroad is not being assessed any part of the "improvement" when it is being assessed the cost of the culvert or bridge. It is being required to pay the costs of a facility appurtenant to the public facility, the drainage ditch, which is necessary to and of benefit primarily to the Railroad.

The *Union Pacific* test is particularly difficult to apply here, because it assumes a deceptively simple dichotomy: If the levy in question generates revenue used exclusively for regulatory purposes, it is not a "tax" within the meaning of § 306, but if it generates revenue for the general fund to provide for public benefits, it is a "tax." However, the provisions in question here neither regulate the industry nor raise general revenue. They serve a different purpose altogether: they imposes upon the user the actual costs, as opposed to a service or use charge, of facilities necessary only to the user, and furthermore impose those costs on the *sole* user, as opposed to a use tax imposed on all users of a public facility, such as an airport terminal.

### b. An alternative test of what is a tax

■ The court therefore turns to a search for other criteria to determine what is a "tax." [10] The court finds from a review of various authorities that the principle charac-

teristics of a tax are that (1) it is enacted pursuant to legislative authority (2) to raise revenue (3) from similarly situated persons (4) for the benefit of the public. Indeed, the First Circuit Court of Appeals describes these characteristics as those of the "paradigmatic" or "classic" tax:

> The classic "tax" is imposed by a legislature upon many, or all, citizens. It raises money, contributed to a general fund, and spent for the benefit of the entire community.

*San Juan Cellular Telephone Co. v. Public Serv. Comm'n of Puerto Rico*, 967 F.2d 683, 685 (1st Cir.1992); *see also National Cable Television Ass'n, Inc. v. United States*, 415 U.S. 336, 340–41, 94 S.Ct. 1146, 1149, 39 L.Ed.2d 370 (1974); *Robinson Protective Alarm Co. v. City of Philadelphia*, 581 F.2d 371, 376 (3d Cir.1978). The court will consider each of these characteristics in turn.

■ *i. Legislative authority.* "[T]axes are the life-blood of government...." *Perez v. Ledesma*, 401 U.S. 82, 127 n. 17, 91 S.Ct. 674, 699 n. 17, 27 L.Ed.2d 701 (1971) (separate opinion of Brennan, J., quoting the statement in *Bull v. United States*, 295 U.S. 247, 259–60, 55 S.Ct. 695, 699–700, 79 L.Ed. 1421 (1935)); *Trailer Marine Transp. Corp. v. Rivera Vazquez*, 977 F.2d 1, 5 (1st Cir. 1992). Thus, legislatures have the exclusive power to levy taxes. U.S. CONST. ART. I, § 8 ("The Congress shall have power to lay and collect taxes"), § 9 (and to appropriate funds); *Bell Atlantic Tel. Cos. v. F.C.C.*, 24 F.3d 1441, 1445 (D.C.Cir.1994) (citing federal constitutional provisions for Congress' exclusive power to tax); *Scripto, Inc. v. Carson*, 362 U.S. 207, 212, 80 S.Ct. 619, 622, 4 L.Ed.2d 660 (1960) (Congress has the exclusive power to levy taxes on interstate commerce); *United States v. Jacobs*, 306 U.S. 363, 370, 59 S.Ct. 551, 555, 83 L.Ed. 763 (1939) ("No more essential or important power has been conferred on Congress" than the power to collect taxes and raise revenues); *Ferman v. United States*, 993 F.2d 485, 492

---

**10.** The court has been frustrated by the frequency with which the definition of taxes or a specific tax is circular ("a tax is a tax ..."). For example, the federal statute authorizing states to levy sales or use taxes states that "a sales or use tax is

defined as 'any tax levied on, with respect to, or measured by, sales ... of tangible personal property....' 4 U.S.C. § 110." *Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 383, 84 S.Ct. 378, 391, 11 L.Ed.2d 389 (1964).

(5th Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 2704, 129 L.Ed.2d 832 (1994); *Sohio Transp. Co. v. United States*, 766 F.2d 499, 502 (Fed.Cir.1985) (Congress has the exclusive power to tax); *Clarion Ready Mixed Concrete Co. v. Iowa State Tax Comm'n*, 252 Iowa 500, 507, 107 N.W.2d 553, 558 (1961) ("[T]he taxing power of the state is exclusively a legislative function, and ... taxes can be imposed only in pursuance of legislative authority."); *City of Dubuque v. Meuser*, 239 Iowa 446, 449, 31 N.W.2d 882, 884 (1948) ("[T]he power to tax is legislative and is vested in the General Assembly by our state constitution.... The power of a municipality to tax is conferred upon it by the legislature."). The Sixth Circuit Court of Appeals emphasized the legislative enactment characteristic of "taxes," for bankruptcy purposes, holding that "[w]here a State 'compell[s] the payment' of 'involuntary exactions, regardless of name,' and where such payment is universally applicable to similarly situated persons or firms, these payments are taxes for bankruptcy purposes." *In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 342 (6th Cir.1993) (citing *New Neighborhoods, Inc. v. West Virginia Workers' Compensation Fund*, 886 F.2d 714, 718–19 (4th Cir.1989)).

■ **ii. Raising revenue.** The Supreme Court has observed that "[c]riminal fines, civil penalties, civil forfeitures, and taxes all share certain features: They generate government revenues, impose fiscal burdens on individuals, and deter certain behavior." *Department of Revenue of Montana v. Kurth Ranch*, — U.S. —, —, 114 S.Ct. 1937, 1945, 128 L.Ed.2d 767 (1994). Courts have narrowly construed what is a "bill to raise revenue" within the meaning of the Origination Clause of the United States Constitution, Art. I, § 7, as "bills to levy taxes in the strict sense of the words, and has not been understood to extend to bills for other purposes which incidentally create revenue." *United States v. Norton*, 91 U.S. (1 Otto) 566, 569, 23 L.Ed. 454 (1875); *United States v. Tholl*, 895 F.2d 1178, 1182 (7th Cir.1990) (citing *Norton*). However, " '[t]he mere fact a statute raises revenue does not imprint upon it the characteristics of a law by which the taxing power is exercised.' " *Chickasaw Nation v. State of Oklahoma ex rel. Oklahoma Tax Comm'n*, 31 F.3d 964, 968 (10th Cir.1994) (quoting *American Petrofina Co. of Texas v. Nance*, 859 F.2d 840, 841 (10th Cir.1988), which in turn quotes *State ex rel. Tindal v. Block*, 717 F.2d 874, 887 (4th Cir.1983), *cert. denied*, 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984)). Nor does deposit of the revenue raised into the general fund necessarily make the levy a "tax." *Id.* Courts ultimately have considered both from whom the revenue is raised and what use is made of the funds raised.

**iii. Similarly situated persons.** The court has already touched upon cases citing the requirement that "taxes" raise revenue from similarly situated persons in its discussion of other characteristics of taxes. This is only natural, because it is these characteristics as a group rather than any one alone that is determinative of what is a tax. However, the point bears independent emphasis. Thus, in *San Juan Cellular Telephone Co.*, the court noted that characteristics of a "classic" tax included its imposition "upon many, or all, citizens." *San Juan Cellular Telephone Co.*, 967 F.2d at 685. In *In re Suburban Motor Freight, Inc.*, the Sixth Circuit Court of Appeals considered an essential characteristic of a tax to be its "compulsory nature" for all similarly situated persons. *Suburban Motor Freight*, 998 F.2d at 342 (one characteristic of a tax is whether it is "universally applicable to similarly situated persons or firms").

**iv. Public Benefit.** In *Cotton Petroleum Corp. v. State of New Mexico*, 490 U.S. 163, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989), the Court recognized that taxes generate funds for public benefits. *Cotton Petroleum Corp.*, 490 U.S. at 190, 109 S.Ct. at 1714–15 (holding, *inter alia*, that "there is no constitutional requirement that the benefits received by an ordinary commercial taxpayer—or by those living in the community where the taxpayer is located—must equal the amount of its tax obligations."); *In re Suburban Motor Freight, Inc.*, 998 F.2d 338, 342 (6th Cir.1993) (noting that "[u]ndoubtedly, Congress provided priority [in bankruptcy] for unpaid tax claims because of the public purpose of tax revenues."). The fact that a

fee generates a fund for public purposes has been held to make the fee a "tax" for bankruptcy purposes. *See, e.g., In re Suburban Motor Freight, Inc.,* 998 F.2d at 341 (citing *Williams v. Motley,* 925 F.2d 741, 744 (4th Cir.1991)).

However, that same court warned against reading the "public benefit" too broadly in determining what is a tax:

> Public benefit is not the determining factor [in what is a tax for bankruptcy purposes], we stressed [in *In re Jenny Lynn Mining Co.,* 780 F.2d 585, 589 (6th Cir.), *cert. denied,* 477 U.S. 905, 106 S.Ct. 3276, 91 L.Ed.2d 566 (1986)]:
>
> > [O]ne purpose of most governmentally imposed fees is to support the agency that administers the program under which the fee is charged, presumably serving some public purpose. If this were the deciding factor, all such fees would be "taxes" for bankruptcy purposes.
>
> *Id.* We instead noted that "the deposit was required because the operator had requested a permit, and the permit bestowed a discrete benefit on the applicant—the privilege of operating a surface mine." *Id.* at 588.

*In re Suburban Motor Freight, Inc.,* 998 F.2d 338, 341 (6th Cir.1993). The court therefore also looked to the levy's "centralized and compulsory nature" for all similarly situated persons before concluding that it was a tax. *Id.* at 342.

■ Certain levies are not "taxes" raising revenues for public benefit when they are charges for use of public facilities. Courts, and it should be added, legislatures, regularly exclude from the definition of "taxes," or at least from the prohibition of anti-tax laws, charges for use of public facilities. In *Northwest Airlines, Inc. v. County of Kent, Mich.,* —— U.S. ——, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994), the Supreme Court considered whether user fees imposed by a public airport violated the federal Anti–Head Tax Act (AHTA), 49 U.S.C. § 1513. The provisions of the AHTA in question prohibited States and their subdivisions from levying a "fee" or "other charge" "directly or indirectly" on "persons traveling in air commerce or on the carriage of persons traveling in air commerce." *Northwest Airlines,* —— U.S. at ——, 114 S.Ct. at 862 (citing 49 U.S.C. § 1513(a)).

In determining the scope of the AHTA in *Northwest Airlines,* the Court first confirmed that the compass of § 1513(a) is not limited to "head" taxes. *Id.* (citing *Aloha Airlines, Inc. v. Director of Taxation of Haw.,* 464 U.S. 7, 12–13, 104 S.Ct. 291, 294–95, 78 L.Ed.2d 10 (1983)). The Court then found that, despite its broad language, the AHTA specifically exempted from its prohibitions "reasonable rental charges, landing fees, and other service charges from aircraft operators for the use of airport facilities." *Id.* (citing 49 U.S.C. § 1513(b)); *Western Air Lines, Inc. v. Board of Equalization of the State of South Dakota,* 480 U.S. 123, 131, 107 S.Ct. 1038, 1042, 94 L.Ed.2d 112 (1987) (§ 1513(d)(3) exempts from prohibitions against discriminatory taxes on interstate air carriers a "tax" that is "wholly utilized for airport and aeronautical purposes."). Similarly, the Supreme Court noted that "fees and charges limited in amount to the approximate cost of services rendered" are excluded from the definition of "import duties and taxes" in Art. 1 of the 1972 Container Convention, although the definition of "import duties and taxes" means "Customs duties and all other duties, taxes, fees and other charges which are collected on, or in connection with, the importation of goods." *Itel Containers Int'l Corp. v. Huddleston,* —— U.S. ——, ——, 113 S.Ct. 1095, 1099, 122 L.Ed.2d 421 (1993).

Furthermore, courts in addition to the *Union Pacific* court have regularly distinguished between a levy that is a "tax" for public benefit and one that is instead a "regulatory fee." Hence, the Supreme Court noted that " 'there comes a time in the extension of the penalizing features of the so-called tax when it loses its character as such and becomes a mere penalty with the characteristics of regulation and punishment.' " *Kurth Ranch,* —— U.S. at ——, 114 S.Ct. at 1946 (quoting *A. Magnano Co. v. Hamilton,* 292 U.S. 40, 46, 54 S.Ct. 599, 602, 78 L.Ed. 1109 (1934)). The First Circuit Court of Appeals explored the distinction between a

"tax," which generates revenue for the public benefit, and a "regulatory fee," which earmarks funds for regulatory purposes in *San Juan Cellular Telephone Co. v. Public Serv. Comm'n of Puerto Rico,* 967 F.2d 683, 685 (1st Cir.1992):

> The classic "regulatory fee" is imposed by an agency upon those subject to its regulation. *See New England Power Co. v. U.S. Nuclear Regulatory Commission,* 683 F.2d 12, 14 (1st Cir.1982). It may serve regulatory purposes directly by, for example, deliberately discouraging particular conduct by making it more expensive. *See, e.g., South Carolina ex rel. Tindal v. Block,* 717 F.2d 874, 887 (4th Cir.1983), *cert. denied,* 465 U.S. 1080, 104 S.Ct. 1444, 79 L.Ed.2d 764 (1984). Or, it may serve such purposes indirectly by, for example, raising money placed in a special fund to help defray the agency's regulation-related expenses. *See, e.g., Union Pacific Railroad Co. v. Public Utility Commission,* 899 F.2d 854, 856 (9th Cir.1990); *In re Justices [of the Supreme Court of Puerto Rico],* 695 F.2d [17,] 27 [ (1st Cir.1982) ]; *see also National Cable,* 415 U.S. at 343–44, 94 S.Ct. at 1150–51.

*San Juan Cellular Telephone Co.,* 967 F.2d at 685; *see also Travelers Ins. Co. v. Cuomo,* 14 F.3d 708, 713 (2d Cir.1993) (citing *San Juan Cellular Telephone Co.,* and emphasizing that the use to which revenue is put is more often determinative than the name of the levy or fund into which the proceeds are put), *cert. granted by New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.,* —— U.S. ——, 115 S.Ct. 305, 130 L.Ed.2d 217 (1994). The court noted that courts often looked to the ultimate use of the revenue generated, whether that purpose is to provide a general benefit to the public or instead is used to benefit regulated companies or defray the costs of their regulation, as determining whether a charge was a "tax" or "regulatory fee." *Id.* (citing the *Head Money Cases* ); *see also Keleher v. New England Tel. & Tel. Co.,* 947 F.2d 547, 549 (2d Cir.1991) ("franchise fee" was a "tax" because money raised was treated as part of city's "general revenue"); *Brock,* 796 F.2d at 489 (contribution to special fund used to reimburse injured workers was not a tax on an area transit authority in violation of the intergovernmental tax immunity doctrine, because the special fund obligation was a permissible user fee, was nondiscriminatory, was structured to produce revenues that would not exceed costs, and was assessed by a formula designed to approximate the employer's fair share of the costs; thus, the fund obligation was regulatory in nature, not revenue raising); *Schneider Transport, Inc. v. Cattanach,* 657 F.2d 128, 132 (7th Cir.1981), *cert. denied,* 455 U.S. 909, 102 S.Ct. 1257, 71 L.Ed.2d 448 (1982) (charge used to help pay for highway construction was a "general" type of public expenditure); *Mississippi Power & Light Co. v. U.S. Nuclear Regulatory Comm'n,* 601 F.2d 223, 228, 231–32 (5th Cir.1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1066, 62 L.Ed.2d 787 (1980) (charge was a "fee," not a "tax," because it helped pay for costs of administrative agency's regulatory activities); *Robinson Protective Alarm Co.,* 581 F.2d at 376 (charge of 5% of gross revenues assessed against fire and burglar alarm companies was a "tax" because it was placed in "general revenue" fund); *but see Chickasaw Nation,* 31 F.3d at 968 (deposit into general fund held irrelevant because "the taxation is an integral part of the overall regulatory structure in a traditionally heavily regulated area, as opposed to a simple revenue measure," and thus was regulatory rather than a "tax").

The analysis of what is a regulatory fee and what is a tax in *San Juan Cellular Telephone Co.,* of course, is essentially the same as that in *Union Pacific.* However, the *San Juan Cellular Telephone Co.* court's examination of what is a tax did not end with this analysis. Instead, the court in *San Juan Cellular Telephone Co.* applied all the of the factors this court has also identified as distinguishing characteristics of a "tax," to conclude that a "periodic fee" was not a "tax." *San Juan Cellular Telephone Co.,* 967 F.2d at 686. The court concluded that because the fee was assessed by an agency, not the legislature, the money was placed in a special fund, not the state's general fund, and was not used for a general purpose, but rather to defray the expenses of regulating

entities within the agency's jurisdiction, it was not a "tax." *Id.*

The First Circuit Court of Appeals twice considered issues raised in *San Juan Cellular Telephone Co.* shortly after that decision was rendered. In *State of Maine v. Department of the Navy,* 973 F.2d 1007, 1012 (1st Cir.1992), the court used that part of the *San Juan Cellular Telephone Co.* test that distinguished between regulatory fees and taxes. However, in *Trailer Marine Transp. Corp. v. Vazquez,* 977 F.2d 1, 5 (1st Cir.1992), the court recognized that the regulatory fee-tax distinction was not always sufficient to determine what was a "tax":

> The most common formula for classifying exactions under the Tax Injunction Act— asking whether the payment is a tax to raise general revenue or is a fee incident to regulation, *see, e.g., San Juan Cellular Tel. Co. v. Public Service Comm'n of Puerto Rico,* 967 F.2d 683 (1st Cir.1992); *Butler* [*v. State of Me. Supreme Judicial Court,*] 767 F.Supp. [17] at 19 [ (D.Me. 1991) ] (collecting cases)—is often useful but does not provide much help in this case. In truth, the purpose of the fee here in issue is neither to raise general revenue for Puerto Rico nor to regulate conduct in the usual sense of the term. The accident-compensation statute is essentially a social welfare program and tort reform law to impose on motor vehicle owners as a class the cost of the accidents they cause and to assure compensation for accident victims....
>
> Th[e] broad purpose [of providing the lifeblood of government] does not cleanly resolve a case, like this one, where the legislature does not call the measure a tax and the money is collected largely as dedicated transfer payments for the beneficiaries....

*Vazquez,* 977 F.2d at 5. Thus, the court applied all of the factors identified by this court and the *San Juan Cellular Telephone Co.* court to determine if the levy on motorists to fund the compensation fund was a tax: it found that the fees paid were held separately from the general state funds, they were dedicated exclusively to reimburse private parties and to cover administrative ex-penses, they were collected only from those seeking the privilege of driving on state highways, and they were proportioned (for motor vehicles as a class) to compensate victims for the specific damage resulting from that activity. *Id.* at 6. Admitting that it was a "close question," the court held that the levy was not a tax. *Id.* In a similar vein is the conclusion of the Seventh Circuit Court of Appeals that a fee must do more than pay the costs of regulation, but must also generate revenues that a municipality can use to offset *unrelated* costs or confer *unrelated* benefits, before it is a tax. *Diginet, Inc. v. Western Union ATS, Inc.,* 958 F.2d 1388, 1392–93 (7th Cir.1992).

### b. Application of the tests

The court concludes that the provisions in question do not impose a "tax" on railroads to the extent that they authorize a cause of action to recover costs. Under either test, a cause of action is not a fee or levy either to regulate or to raise revenue, but a means of recovering costs incurred by the board that, by law, should have been borne by the railroad.

Nor do the provisions in question impose a "tax" on railroads under this court's "four-characteristics test" to the extent that they assess railroads for the part of a construction project, the culvert or bridge, that is merely coincidental to the public improvement. Although the provisions in question are enacted by the legislature, they do not raise "revenue." If the railroad builds the culvert or bridge as directed, the railroad bears the cost of a benefit only it needs, and the board receives nothing. If, on the other hand, the board is forced by the railroad's refusal to act to build the culvert or bridge itself, the board, if it prevails in a court action, will only be reimbursed for its actual construction costs.

Even if the recovery of costs could be construed to be "raising revenue," that revenue is not raised from a group of similarly situated persons, but from a single obligor. Although all railroads are subject to the provisions of chapter 468 in question, railroads as a class are not subjected to any specific obligation. Rather, only those railroads

whose rights-of-way are actually crossed by a drainage district facility that is being improved are individually subjected to the costs of the specific culvert or bridge needed by the individual railroad. In this respect, the provisions of chapter 468 in question here act more like a service charge or use fee which is imposed only upon the party obtaining the direct benefit. The charges to any particular railroad are limited in amount to the approximate cost of services rendered or facilities used. *See Western Air Lines,* 480 U.S. at 131, 107 S.Ct. at 1042; *Itel Containers Int'l Corp.,* — U.S. at ——, 113 S.Ct. at 1099.

For much the same reason, the revenue raised, if revenue it is, is not used for a public purpose. As in *Vazquez,* 977 F.2d at 5, the purpose of the recovery of costs here in issue is neither to raise general revenue for the drainage district nor to regulate conduct in the usual sense of the term. The costs imposed upon railroads as a class are the costs of the facilities they will use, but the imposition of those costs is not upon the class. Rather, it is imposed on a railroad-by-railroad and project-by-project basis. Although the public may receive some benefit from the building of the culvert or bridge, because some provision must be made for the flow of water across a railroad right-of-way, a drain alone would serve the public purpose, while the railroad receives the principal benefits from the building of the facility necessary to carry the roadbed over the drainage improvement. The right to cross over the drainage ditch comes at a cost. The Railroad must pay for and maintain the crossing. Furthermore, any revenues raised are not used to offset *unrelated* costs or confer *unrelated* benefits. *Diginet, Inc.,* 958 F.2d at ·1392–93. Thus, under the court's "four-characteristics test," the provisions of chapter 468 in question here do not impose a "tax" upon the Railroad.

In the alternative, in terms of the *Union Pacific* test, the primary purpose of the requirement that the Railroad bear the costs of the culvert or bridge is not to benefit the general public, even if the general purpose of the drainage system statutes, identified in Iowa Code § 468.1, is to provide a drainage system for public benefit. The general benefits only incidentally from the bridge or culvert; the primary benefit to the public comes from the drainage facility the bridge or culvert crosses. The primary purpose of requiring the Railroad to bear the costs of the bridge or culvert is, obviously, to require the Railroad to bear the costs of additional facilities necessary to the Railroad.[11]

Even though there is no legislative history available, the court concludes that there are logical reasons for providing in the first instance for railroads, rather than the drainage districts, to build culverts or bridges over drainage improvements where those improvements cross railroad rights-of-way. First, the legislature could reasonably have believed that the railroad had superior information and superior design and construction expertise necessary to build a culvert or bridge adequate to carry the railroad's roadbed over the drainage improvement. The legislature could also have deemed it appropriate to leave to the railroad the scheduling of such building to cause the minimum of disruption to railroad operations along the stretch of roadbed involved. Such rationales for these provisions are particularly appropriate in view of the fact that the railroad is the only entity to benefit from the culvert or bridge ultimately built.

Comparing this primary purpose of the Iowa scheme embodied in Iowa Code §§ 468.109–113, the purpose of requiring railroads to bear the costs of additional facilities necessary only to the railroads, to the pri-

**11.** It is in this respect that the imposition of the costs of the bridge or culvert differs from the assessment of the costs of other improvements to rights-of-way, such as sidewalks, upon a property owner. The court is quite willing to admit that the assessment upon a property owner for sidewalks is a tax. Like the provisions of chapter 468, which first offer the railroad the option of building the bridge or culvert rather than having the work done by the governmental subdivision, under the usual municipal ordinance, the property owner is given the alternative of putting in the sidewalk or being assessed the costs of having the municipality put it in. However, the resulting sidewalk is plainly for the public benefit; the culvert or bridge is just as plainly solely for the railroad's benefit. The sidewalk is a *public* right-of-way. The railroad's right-of-way is a private one.

**1308**

mary purpose of the 4–R Act it is said to violate, the court finds no conflict. The purpose of the 4–R Act is to prevent the imposition upon railroads of a disproportionate share of the costs of public benefits. A scheme imposing upon railroads the costs of facilities necessary only for the railroads' benefit does not run afoul of this purpose of the 4–R Act. The purpose of the state's scheme is neither to regulate the industry nor to raise general revenue. As the court held above, Iowa's scheme serves a different purpose altogether: it imposes upon the user the actual costs of facilities necessary only to the user that are merely coincidental to, not integral parts of, the public improvement. Thus, under the *Union Pacific* test, the provisions in question here do not impose a "tax."

The court concludes that the provisions of Iowa Code Ch. 468 and the Board's action pursuant to the provisions simply do not violate the provisions of the 4–R Act. In reaching this conclusion, the court is mindful that in legislating the 4–R Act, Congress specifically chose the word "tax" rather than a broader provision using terms such as "fee" or "other charge" which Congress chose in the Anti–Head Tax Act (AHTA). Unlike this broad language of the AHTA, the 4–R Act prohibits a "tax" that is "discriminatory." The court concludes that Congress intentionally chose the narrow term "tax" for the 4–R Act rather than the broader terms found in the AHTA, which arguably would have covered the situation presented here, to address a narrower set of governmental actions. However, the court will consider as an alternative, whether Iowa's scheme, if it is a "tax," is "discriminatory," and thus violative of § 306 of the 4–R Act.

**2. Is any "tax" imposed "discriminatory"?**

■ Although a complaint under § 306 of the 4–R Act is premised upon discriminatory treatment, the Supreme Court has held that the plaintiff making a § 306 claim need not show intent to discriminate in order to prevail. *Burlington Northern R. Co. v. Oklahoma Tax Comm'n*, 481 U.S. 454, 463–64, 107 S.Ct. 1855, 1861, 95 L.Ed.2d 404 (1987); *see also Richmond, Fredericksburg & Potomac R. Co. v. Forst*, 4 F.3d 244, 249 (4th Cir.1993); *Burlington Northern R. Co. v. Bair*, 766 F.2d 1222, 1226 (8th Cir.1985); *Burlington Northern R. Co. v. Bair*, 815 F.Supp. 1223, 1227 (S.D.Iowa 1993). The issue of whether a "tax" is "discriminatory" in violation of § 306 is sufficiently complicated, however, even without the necessity of considering discriminatory intent.

In *ACF Industries*, the Court considered whether subsection (b)(4) allowed a State to grant exemptions from a generally applicable ad valorem property tax without exposing the taxation of railroad property to invalidation under that subsection, concluding that it did. *ACF Indus.*, —— U.S. at ——, 114 S.Ct. at 848. Unfortunately, *ACF Industries* posed a question and provided an answer not dispositive of the present matter.

CNW argues that the provisions of Iowa Code Ch. 468, which pertain expressly only to railroads, are facially discriminatory.[12] The Board argues that other provisions of Iowa Code Ch. 468 also require state and local governments to build or pay for culverts or bridges where their rights-of-way cross drainage systems. The Board asserts that the only difference between those provisions and the ones invoked against the Railroad are that the provisions pertaining to rail-

**12.** CNW argues that the obligation imposed upon the railroad is discriminatory because no other "commercial or industrial taxpayer" is so obligated, citing *City of Superior*, 932 F.2d at 1187. However, *City of Superior* does not establish that this is the proper body of taxpayers to whom a railroad is to be compared for the purposes of subsection (b)(4) as the Railroad asserts. Instead, *City of Superior* identifies this as the proper group for comparison in the case of a property tax under (b)(1)–(3). *Id.* Of more relevance to the present discussion would be the conclusion of the Iowa Supreme Court in *Atchison, Topeka & Santa Fe Ry. Co. v. Bair*, 338 N.W.2d 338, 346 (Iowa 1983), *cert. denied*, 465 U.S. 1071, 104 S.Ct. 1427, 79 L.Ed.2d 751 (1984), holding that when a property tax is not involved, the proper group for comparison is "taxpayers who employ [the same product or facility]," which, in that case, was propulsion fuel. In this case, the court agrees with the Board that the proper comparison would be with other owners of surface rights-of-way. The Board then argues for a comparison with states and counties, each of which have rights-of-way for roads. However, these are public, not private, entities.

roads provide for a civil action to recover costs, while those pertaining to governmental entities instead provide for a *mandamus* action.[13]

In *Burlington Northern R. Co. v. City of Superior, Wis.*, 932 F.2d 1185 (7th Cir.1991), the Seventh Circuit Court of Appeals considered whether a statute that was facially discriminatory, because it imposed obligations only on railroads, could be shown to be non-discriminatory by comparison of the provisions in question with those applicable to other kinds of taxpayers imposing similar, or even identical, obligations. *City of Superior, Wis.*, 932 F.2d at 1188. The argument offered by the Board here did not succeed with the Seventh Circuit Court of Appeals in *City of Superior*. The court concluded that

[f]or today it is enough to hold that a state cannot be allowed to place staggering burdens of inquiry on the judicial system by picking out a narrow class of activities that just happen to be engaged in solely by railroads, or a narrow set of inputs (boxcars, for example) that just happen to be used only in railroading; taxing that class; and asking the court to consider whether the state's tax system as a whole avoids burdening the railroad industry disproportionately.

Another difficult question that we need not decide today is how the judicial inquiry should be structured if the tax is imposed on an activity in which railroads are not the sole, but are the principal actors.... *Trailer Train Co. v. Leuenberger*, ... 885 F.2d [415,] 418 [ (8th Cir.1988), *cert. denied sub nom. Boehm v. Trailer Train Co.*, 490 U.S. 1066, 109 S.Ct. 2065, 104 L.Ed.2d 630 (1989) ], holds, sensibly in our view, that the inclusion of some nonrail activities in a class of activities dominated by railroads does not immunize a tax from challenge under section 306.

*Id.* Thus, under the view of the Seventh Circuit Court of Appeals, this court should not be persuaded by the Board's argument that other provisions of the drainage system

statutes impose similar duties on other owners of rights-of-way.

The Eighth Circuit Court of Appeals has also rejected the argument offered by the Board that a statute facially discriminatory to railroads can be shown to be non-discriminatory by reference to other aspects of the state's taxation scheme:

In *Ogilvie v. State Bd. of Equalization*, 657 F.2d 204 (8th Cir.), *cert. denied*, 454 U.S. 1086, 102 S.Ct. 644, 70 L.Ed.2d 621 (1981), the state of North Dakota argued that its tax system was equitable and not violative of Section 306 because the higher property tax imposed upon railroads was offset by a business privilege tax that other businesses were required to pay and railroads were not. *Ogilvie*, 657 F.2d at 207-10. We first quoted with approval the conclusion of the district court that " '[t]he most obvious form of tax discrimination is to impose a tax on a class of rail transportation property that is not imposed on other nonrailroad property of the same class.' " *Id.* at 210. The Court then went on to state that "North Dakota's rationalization that they have an equitable tax system because of a business privilege tax is nothing more than an attempt to resurrect ... an exemption from § 306 for states with a 'reasonable classification of property.' Congress did not accept the proposal and this court will not accept it." *Id.*

We are bound by the reasoning of ... *Ogilvie*.

*Trailer Train Co.*, 929 F.2d at 1303. Thus, this court is bound to conclude that the Board cannot rehabilitate a facially discriminatory statute by comparing it with other provisions of a broader scheme imposing similar obligations on non-railroad entities. However, that does not mean that the court concludes that the provisions in question here impose a discriminatory tax.

The Supreme Court considered what kinds of taxes are discriminatory to interstate carriers in *Western Air Lines:*

---

13. The Board is correct in its assertion that a mandamus action will lie against a governmental entity that refuses to construct a bridge over a drainage ditch as required by § 468.108. *See*

*Robinson v. Board of Supervisors of Davis County*, 222 Iowa 663, 269 N.W. 921, 924–25 (1936); *Perley v. Heath*, 201 Iowa 1163, 208 N.W. 721 (1926).

The ability to use taxes levied on an interstate carrier to subsidize general welfare spending does not exist, of course, when the proceeds are allocated directly and entirely to the benefit of the carrier. Not only is the possibility of discriminatory benefits to state residents eliminated, but also the specter of discriminatory burdens on the carrier is avoided by the recycling of the tax revenues into the specific facilities used by the carrier.

*Western Air Lines v. Board of Equalization,* 480 U.S. 123, 131–32, 107 S.Ct. 1038, 1043, 94 L.Ed.2d 112 (1987) (emphasis added). Thus, the court held that South Dakota's levy of a tax on airline flight property, the proceeds of which are wholly utilized for airport and aeronautical purposes, did not violate the antidiscriminatory legislation. *Id.*

Although the Supreme Court held in *Western Air Lines* that a tax that recycled its revenues into specific facilities used by the interstate carrier was not discriminatory, the Seventh Circuit Court of Appeals found that the 4–R Act "forbid[s] states to tax railroad property proportionately more heavily than other commercial and industrial property, even if the railroad derives a greater benefit from the public services defrayed by the tax." *Burlington Northern R. Co. v. City of Superior, Wis.,* 932 F.2d 1185, 1187 (7th Cir. 1991). Thus, the distinction is between using the proceeds *wholly* for the benefit of the railroad, versus using the proceeds for a public service from which the railroad primarily benefits, but so does the public generally.

In this case, as in *Western Air Lines,* the court concludes that there can be no fear that the Iowa scheme is discriminatory against railroads. The scheme does not grant boards of supervisors the ability to use "taxes" levied on an interstate carrier, in the form of the costs the railroad is required to bear in constructing a bridge or culvert or the costs the board recovers in a civil action when the railroad refuses to do the construction and the board must pay for it itself, to subsidize general welfare spending. The proceeds of the lawsuit, or the costs borne by the railroad if it undertakes the construction as directed, are allocated directly and entirely to the benefit of the carrier. The culvert or bridge is of no benefit to the drainage scheme. It benefits only the railroad, which wishes to cross the drainage system ditch or drain. Not only is the possibility of discriminatory benefits to state residents eliminated, but also the specter of discriminatory burdens on the carrier is avoided by the recycling of these "tax" revenues into the specific facilities used by the carrier. The provisions of Iowa Code § 468 in question here and the Board's actions pursuant to those provisions do not impose a "discriminatory tax" on the Railroad.[14]

### III. CONCLUSION

The court concludes that the Railroad has not been subjected to a "discriminatory tax" in violation of § 306 of the 4–R Act. The court concludes that the imposition upon the Railroad of the costs of construction of a culvert or bridge over a public drainage system facility is simply not a "tax." The costs imposed are not a per capita or per item or per service levy on a railroad, nor are they any other sort of "fee." Nor do the provisions in question impose an income tax, a gross-receipts tax, a use tax, or an occupation tax. The court concludes that statutory au-

---

14. The court observes that there is something of an anomaly in the Iowa statutory provisions, in that the cause of action authorized is for the entire costs of the "improvement," presumably including the culvert or bridge, in § 468.112. However, when read in conjunction with § 468.113, it is plain that the railroad will ultimately bear the costs only of the bridge or culvert, and not of the entire improvement, even if the board wins its cause of action to recover costs. The court suggests that a more sensible statutory scheme would have provided that the board's cause of action was only for the costs of the culvert or bridge, thus eliminating the need

for a railroad to claim a defense or set-off of damages in the amount of the costs of the improvement. Such a statutory scheme would provide for "one-step" litigation, instead of requiring the two steps of a suit for the entire costs of the construction undertaken on the railroad's right-of-way with a counterclaim or affirmative defense based on subtracting from the total costs the costs of the public improvement proper. However, the court cannot legislate, and must apply the statutes as enacted by the legislature, and will assume that there may have been some method in the legislature's rather odd statutory scheme.

1311

thorization of a cause of action to recover construction costs simply is not a state action in any way similar to "taxation" within the meaning of § 306.

The court developed a "four-characteristics test" to assist it in determining what is a "tax." The four characteristics of a paradigmatic or classic tax are that (1) it is enacted pursuant to legislative authority (2) to raise revenue (3) from similarly situated persons (4) for the benefit of the public. Applying this tax to the provisions of chapter 468 in question, the court concludes that the "tax" in question here has only the first characteristic, legislative enactment. However, the code provisions do not raise "revenue," but only provide for reimbursement for construction costs, and then only if the board succeeds in a civil action to recover them. Even if the provisions raise "revenue," that revenue is not raised from a group of similarly situated persons, but from a single obligor in a manner similar to a service charge or use fee which is imposed only upon the party obtaining the direct benefit, because the charges to any particular railroad are limited in amount to the approximate cost of services rendered or facilities used. Finally, any "revenue" raised is not used for a public purpose. Instead, only the railroad benefits from the building of the facility necessary to carry its roadbed over the drainage improvement, and any revenues raised are not used to offset *unrelated* costs or confer *unrelated* benefits for the general public.

In the alternative, applying the test formulated in *Union Pacific,* the court concludes that a scheme imposing upon railroads the costs of facilities necessary only for the railroads' benefit does not run afoul of the purpose of the 4–R Act. The purpose of the state's scheme is neither to regulate the industry nor to raise general revenue. It serves a different purpose altogether: it imposes upon the user the actual costs, as opposed to a service or use charge, of facilities necessary only to the user. This purpose does not conflict with the purpose of the 4–R Act of preventing the imposition upon railroads of a disproportionate share of the costs of public benefits. Thus, under the

*Union Pacific* test, the provisions in question here do not impose a "tax."

Even if the court were to hold that the provisions of Iowa Code Ch. 468 in question here impose a "tax" upon the Railroad, the court concludes that it is not "discriminatory." The statutory scheme does not grant boards of supervisors the ability to use "taxes" levied on an interstate carrier, in the form of construction costs recovered from or paid by the railroad, to subsidize general welfare spending. The proceeds of the lawsuit, or the costs borne by the railroad if it undertakes the construction as directed, are allocated directly and entirely to the benefit of the carrier. The culvert or bridge is of no benefit to the drainage scheme. It benefits only the railroad, which wishes to cross the drainage system ditch or drain.

Because the court concludes that the Railroad has not been subjected to a "discriminatory tax" in violation of § 306 of the 4–R Act, it accords the Railroad no relief. The Railroad's motion for summary judgment is denied, and the Board's cross-motion for summary judgment is granted. The Board's action in state court may proceed without conflict with the provisions of the 4–R Act.

**IT IS SO ORDERED.**